UNITED STATES, Appellee,

v.

Rockey J. REED, Captain, U.S. Marine Corps, Appellant.

No. 99–0811.
Crim.App. No. 97–1378.

U.S. Court of Appeals for the Armed Forces.

Argued April 5, 2000.

Decided Aug. 31, 2000.

Sullivan, J., concurred and filed opinion.

Cox, Senior Judge, dissented and filed opinion.

CRAWFORD, C.J., delivered the opinion of the Court, in which SULLIVAN, GIERKE, and EFFRON, JJ., joined. SULLIVAN, J., filed a concurring opinion. COX, S.J., filed a dissenting opinion.

For Appellant: *Jack B. Zimmerman* (argued); *Terri R.Z. Jacobs* and *Lieutenant Commander L.J. Lofton,* JAGC, USN (on brief).

For Appellee: *Major Mark K. Jamison,* USMC (argued); *Colonel Kevin M. Sandkuhler,* USMC, and *Commander Eugene E. Irvin,* JAGC, USN (on brief).

Chief Judge CRAWFORD delivered the opinion of the Court.

Appellant was tried on April 16 and May 20–22, 1996, by a general court-martial, military judge sitting alone. The charges and specifications of which appellant was convicted were two specifications of making false official statements, in violation of Article 107, Uniform Code of Military Justice, 10 USC § 907, and one specification of larceny, in violation of Article 121, UCMJ, 10 USC § 921.

The military judge sentenced appellant to be dismissed from the service. On February 3, 1997, a post-trial session under Article 39(a), UCMJ, 10 USC § 839(a), was held. The convening authority approved the sentence, and the Court of Criminal Appeals affirmed the findings and sentence. 51 MJ 559 (1999). We granted review of the following issues:

I. WHETHER THE FINDINGS SHOULD BE SET ASIDE BECAUSE THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN THE FINDINGS OF GUILTY.

II. WHETHER THE FINDINGS SHOULD BE SET ASIDE BECAUSE THE FACTUAL–SUFFICIENCY ANALYSIS OF THE COURT OF CRIMINAL APPEALS WAS CLEARLY ERRONEOUS.

III. WHETHER APPELLANT'S RIGHT TO BE FREE FROM AN EXCESSIVE FINE UNDER THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE EFFECT OF HIS SENTENCE WAS THE LOSS OF $700,000 IN RETIREMENT BENEFITS FOR THE ALLEGED THEFT OF A $145.00 GOVERNMENT COMPUTER MODEM AND RELATED FALSE OFFICIAL STATEMENTS.

FACTS

Appellant was the Instructor–Inspector (I & I—the active duty cadre) of a Marine Corps Reserve Center (MCRC) in Wichita, Kansas. On November 1, 1994, the unit received a shipment of computer gear. The shipment came in a multi-pack box that contained two boxes of computer equipment. The multi-pack box was placed outside appellant's office. The shipping documents reflect that the MCRC in Wichita received a printer, three boxes of software upgrades for Lotus Notes, and a Hayes Accura 144 + Fax modem. One box was factory sealed and contained only the printer. Appellant had the printer box moved to the administrative office where it was unpacked and the printer installed.

According to appellant's report, the second box was moved to his office. When appellant told Gunnery Sergeant (GySgt) Benford, a member of the I&I staff, to take the box out of appellant's office, it contained only the lotus notes—word processing software. The packing slip was missing. However, at some time, a packing slip and a DD Form 250, confirming delivery of a Hayes modem, showed up in GySgt Benford's files. When the missing modem first came to light, GySgt Benford was asked about the packing slip. GySgt Benford never remembered seeing a packing slip, but later the original packing slip appeared in his files without his knowledge. Appellant had unfettered access to GySgt Benford's office and on two occasions called GySgt Benford at home to inquire about how he locked his office door. This was unusual as appellant never had telephoned GySgt Benford at home before. Most significantly, appellant told GySgt Benford that if he implicated appellant in stealing the modem, it would be adversely reflected in the loyalty block of his performance evaluation.

The modem was not missed for 4 months, until March 1995. At this time, First Sergeant (1stSgt) Gregory W. Grizzle, U.S. Marine Corps, supply chief for the MCRC, requested a modem with a higher speed because the old modem took too long to download data. This request went through Marine Corps Reserve Headquarters in New Orleans, La. The reserve headquarters advised the MCRC that a faster modem was sent on November 1, 1994, along with an HP printer and Lotus Notes software. This led to a search for the modem.

Of the personnel assigned to the MCRC, only appellant remembered having seen an empty modem box which he thought had been discarded by reserves over a weekend. Despite an extensive wall-to-wall search of the MCRC, the modem was not found. No reserves remembered having seen a distinctive pink-colored modem box.

When appellant was first apprised of the missing modem, he did not appear to be upset, an unusual reaction for him. Appellant then brought a Hayes Accura modem, still in its packing box but with the serial numbers removed from the outside, into the office on loan until a replacement arrived. Appellant told several different stories as to how he came into possession of this modem. On one occasion he told the First Sergeant that he had bought the modem from a neighbor. On others he stated that he had purchased it from a retired Navy Chief who had happened to come by the reserve center.

After a search of the unit failed to produce the modem, appellant informed his battalion commander of the loss. He was directed to do an informal supply manual investigation. This lead to the false-statement charges.

On August 2, 1995, appellant set out to drive from Wichita to Charlotte, North Carolina, for training, arriving in Charlotte on August 4, 1995. On his way, and on August 2, 1995, appellant met with Major (Maj) Jeffrey S. Butter, U.S. Marine Corps Reserve, in Tulsa, Oklahoma. The meeting began at around 10:00 in the morning and lasted almost 2 hours.

On August 4, 1995, a package addressed to appellant arrived at the MCRC. The box was postmarked August 2, 1995, from Oklahoma City, Oklahoma. The box contained a Hayes modem with an anonymous note, which expressed an apology for taking the modem. Maj Butter gave the unopened box to appellant's wife. Both Mrs. Reed and her daughter handled the box and the modem. On August 17, 1995, a Naval Criminal Investigative Service (NCIS) Special Agent picked up the box and its contents from appellant's wife. NCIS dusted the box, the anonymous note, and the modem for fingerprints. Although the box contained latent fingerprints, the modem contained no fingerprints at all. Appellant's wife strongly denied wiping the modem clean.

Trial counsel argued that appellant sent the modem to himself and manufactured an alibi that would put him in Tulsa, rather than Oklahoma City, on August 2, 1995. Maj Butter testified that it would be relatively easy to leave Wichita in the morning of August 2, 1995, drive to Oklahoma City, then to Tulsa, by 10:00 in the morning. This modem also had no serial numbers and the usual

location of a serial number appeared to be scratched.

After appellant's conviction, but prior to acting on the sentence, the convening authority was apprised of a post-trial affidavit executed by Mr. Mickey R. Cambron, dated October 22, 1996. Mr. Cambron, a former Gunnery Sergeant, claimed in his affidavit that he had taken the modem and that he was the person who had anonymously mailed the modem. Based on this evidence, the convening authority ordered a post-trial Article 39(a), UCMJ, 10 USC § 839(a), session to inquire into the factual matters presented in Mr. Cambron's affidavit.

Mr. Cambron could not remember which hand he used to write appellant's address on the box mailed from Oklahoma City. Trial counsel requested Mr. Cambron to write appellant's address using his right hand and then his left hand. A comparison of the address written on the package mailed from Oklahoma City and Mr. Cambron's writing exemplars led the military judge to find that Mr. Cambron was not the person who addressed the box mailed from Oklahoma City. Mr. Cambron's testimony concerning the package and other matters was so inconsistent that the military judge concluded that he "did not believe [Mr. Cambron's] testimony for one minute."

### 1. May 5, 1995, Statement

Appellant was directed to conduct a preliminary investigation into the loss of the modem by his immediate supervisor, Lieutenant Colonel (LtCol) Steffensen. Appellant completed his investigation and sent his conclusions to LtCol Steffenson on May 5, 1995. Appellant stated that UPS delivered two boxes of computer assets, and according to the packing list, I&I Wichita received an HP printer, a Hayes modem, and Lotus Notes software. Appellant stated that the box containing the printer was unpacked, but that the other box was opened, but not inventoried and "placed in the training/ISC office (next to, but not in a wall locker) [where it] remained ... for approximately two months." This statement was the basis for the first false-statement charge. Master Sergeant (MSgt) Brahme, the training chief,

testified that at no time was a box with computer assets stored next to the wall locker located in his office, the training office.

### 2. May 10, 1995, False Statement Regarding The Purchase of the Modem

When appellant's commanding officer learned that appellant brought a similar modem into the office, he appointed Captain (Capt) Hardy, USMC, to conduct an investigation. During that investigation Capt Hardy questioned appellant about the replacement modem he brought to the office. In his written statement, appellant claimed he bought a replacement modem from a retired Navy Chief Petty Officer he met at the MCRC in late February or early March 1995. This statement was the basis for the second false-statement charge.

Petty Officer Collins testified that he saw appellant talking to an older-looking man. He corroborated appellant's description of this person as not very well groomed. He, appellant, and the older-looking man all smoked cigarettes together and discussed serving time on Guam. Petty Officer Collins went back into the office after smoking one cigarette and stayed for an additional half-hour before leaving for the day. Before Collins left, appellant came into his office and talked about Guam; he mentioned he had bought a modem. Appellant stated that the modem was in the back seat of the retired chief's vehicle. Petty Officer Collins testified the chief's truck did not have a back seat.

More importantly, appellant stated that this purchase occurred in late February or early March of 1995. This was refuted by Petty Officer Collins, who testified that the conversation occurred sometime in April. He was able to pinpoint the time because of a big snow storm in early March.

### DISCUSSION

### 1. Issues I & II

Appellant argues that the lower court did not conduct a proper legal and factual-sufficiency analysis because (1) there is no direct evidence that appellant stole or wrongfully appropriated the modem; (2) the lower court

did not adequately take into account appellant's good military character in accordance with *United States v. Pond,* 17 USCMA 219, 38 CMR 17 (1967); and (3) the lower court did not consider Article 32, UCMJ, 10 USC § 832, testimony indicating that the model number of the modem received by the MCRC in November of 1994 was different from the replacement modem appellant brought to work in March of 1995.

### Standard of Review

■ The test for legal sufficiency requires courts to review the evidence in the light most favorable to the Government. If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 MJ 324 (CMA 1987).

■ The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," the court is "convinced of the accused's guilt beyond a reasonable doubt." *Turner,* 25 MJ at 325.

Viewed as a whole, we hold that the evidence is legally sufficient for a rational factfinder to find beyond a reasonable doubt that appellant stole the modem and then engaged in an elaborate cover-up after the modem was discovered to be missing, including making false official statements. We affirm the court below in finding the evidence to be legally and factually sufficient.

### Larceny/Wrongful Appropriation

■ Appellant claims that there is no direct evidence that the modem was ever received or that appellant stole or wrongfully appropriated it. The record is, however, replete with sufficient circumstantial evidence.

With respect to the receipt of the modem, the evidence shows that a November 1, 1994, the MCRC received a shipment of computer gear in a multi-pack box. One box contained a printer; appellant had this box moved to the administrative office where it was unpacked and the printer was installed. According to appellant's report, the second box was moved into his office. When appellant told GySgt Benford to remove the box, it contained only Lotus Notes—word processing software. GySgt Benford testified that when he removed the box, he took it and locked it in a vault in his office.

Later, appellant was directed to conduct a preliminary investigation into the loss of the modem. As part of that investigation, appellant made a statement on May 5, 1995, that the box taken from his office was "placed in the training/ISC office (next to, but not in a wall locker) [where it] remained ... for approximately two months." However, MSgt Brahme, the training chief, testified that at no time was a box with computer assets stored next to the wall locker in his office, the training office. This statement was the basis for the first false-statement charge.

Although GySgt Benford never saw a packing slip in November 1994 when the boxes were delivered, in March, after it was discovered that the modem was missing, the packing slip and a DD Form 250, confirming delivery of the modem, mysteriously showed up in GySgt Benford's files, among other invoices. Appellant telephoned GySgt Benford at home on two occasions to ask how to open the lock on his office door. This was unusual as appellant never had telephoned GySgt Benford at home before. Of great significance is the evidence that appellant told GySgt Benford that if he implicated appellant in stealing the modem, it would be adversely reflected in the loyalty block of his performance evaluation.

When appellant was apprised of the missing modem in March 1995 by GySgt Benford, appellant took the loss with uncharacteristic calmness. Appellant claimed to have seen an empty modem box during a recent office move and claimed he told reservists to throw the box away. Shortly thereafter, GySgt Benford asked the reservists whether any of them had seen a modem box, but none had. Appellant also told GySgt Benford not to worry, that he had a modem at home that he bought from a neighbor and he would bring it in for office use. Appellant brought an apparently new modem into the office, still in

its packing box. GySgt Benford examined the modem and the box for serial numbers, but found none. Later, appellant claimed to have purchased the modem from a retired Chief Petty Officer who visited the MCRC in February 1995. Not only did the story change, but the date was disputed, placing the retired Chief Petty officer at the MCRC in March 1995, after the discovery of the missing modem. This contradicted appellant's wife's testimony that she saw the modem in their home in February and was the basis for the second false-official-statement charge.

To complicate matters further, on August 4, 1995, a package addressed to appellant arrived at the MCRC. The unopened box was given to appellant's wife. When opened, the box contained a Hayes modem, also with no serial number, and an anonymous note expressing an apology for taking the modem. Although both appellant's wife and his daughter handled the box and the modem, strangely enough, no latent fingerprints were found on the modem. Appellant's wife strongly denied wiping the modem clean.

The evidence also showed that on August 2, the date the package was mailed, appellant set out to drive from Wichita to Charlotte, North Carolina, for training. Also, on August 2, appellant met with Maj Butter in Tulsa, Oklahoma, at around 10:00 in the morning. Maj Butter testified that it would be easy to leave Wichita in the morning and drive to Oklahoma City and then to Tulsa by 10:00 in the morning. This evidence strongly supports the Government's contention at trial that appellant sent the modem to himself and manufactured an alibi that would put him in Tulsa, rather than Oklahoma City on August 2, 1995.

Even after trial, the saga continued. After appellant's conviction, but before acting on the sentence, the convening authority was apprised of a post-trial affidavit executed by a former Marine Gunnery Sergeant, Mr. Cambron. Mr. Cambron claimed in his affidavit that he had taken the modem and that he had anonymously mailed the modem and the note. Based on this evidence, the convening authority ordered a post-trial Article

39(a) session to inquire into these assertions. By looking at handwriting exemplars the military judge concluded that Mr. Cambron did not address the box or write the note. Further, the military judge concluded that he did not believe Mr. Cambron's testimony.

In fact, the sum total of this evidence strongly supports the Government's trial theory that a modem was received, appellant stole it, and then engaged in an extensive cover-up that even extended post-trial.

### Good Military Character

■ Essentially appellant argues that his good military character created a reasonable doubt at the appellate level and the finding must be set aside. Appellant reads *Pond* far too broadly. It is true that this Court noted in passing that good military character may be sufficient to create a reasonable doubt. *See* 17 USCMA at 227, 38 CMR at 25. However, this Court set aside the finding of guilty because the law officer (now military judge) erroneously limited the defense in presenting its case at trial and failed to give the members an appropriate instruction on the credibility of the witnesses. We did not "compare[ ] the evidence of Lieutenant Pond's good military character to the Government's evidence ..." as appellant asserts. Final Brief at 14.

■ Moreover, there is nothing in the language of *Pond* which requires a Court of Criminal Appeals to make a finding that such evidence is not cogent or irresistible. Additionally, *Pond* is overruled to the extent it is inconsistent with the test of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In fact, this Court has specifically held that a Court of Criminal Appeals need not specifically address all arguments raised by an appellant. In *United States v. Matias*, 25 MJ 356 (1987), we stated that "we are aware of no requirement of law that appellate courts in general or a court of military review [now the Court of Criminal Appeals] in particular must articulate its reasoning on every issue raised by counsel." 25 MJ at 363. There is nothing in the opinion that would lead one to conclude that the lower court did not give each of appellant's

assignments of error careful consideration or that it was unfamiliar with the record.

## Article 32 Testimony

Appellant also sets up a straw man concerning the relevance of testimony at the Article 32, UCMJ, 10 USC § 832 hearing, concerning the make/model numbers of the modem stolen and the modem appellant brought to work. Appellant was charged with stealing the modem shipped. The fact that appellant brought a modem to work is relevant only in that it implicates appellant in the May 10 false official statement as to where appellant claimed to have obtained the modem he brought in to the office. Proof that the modem appellant brought to work is the same one stolen is not necessary.

█ Appellant argues the court below erroneously relied on *United States v. Bethea*, 22 USCMA 223, 46 CMR 223 (1973), in rejecting the argument that information from the Article 32 investigation should be considered in evaluating guilt under Article 66, UCMJ, 10 USC § 866 (1994). In *Bethea* this Court held that for purposes of appellate review of issues at trial, the "record" refers only those matters introduced at trial. *See* 22 USCMA at 225, 46 CMR at 225. Appellant argues that *Bethea* was decided at a time when "it was not clear that the Article 32 hearing included the right of the defense to cross-examine Government witnesses." *See* Final Brief at 26. He also asserts that Air Force, Army, and Coast Guard Courts of Criminal Appeals or their predecessor courts have all held that the appellate courts may consider information contained in the allied papers or the record. *Id.* at 25.

Appellant cites three cases in support of his argument: *United States v. Rhodes*, 40 CMR 462 (ABR 1969); *United States v. Strode*, 39 MJ 508 (AFCMR 1993), *aff'd*, 43 MJ 29 (1995); and *United States v. Hayes*, 40 MJ 813 (CGCMR 1994). However, examination of those cases shows that they do not support appellant's argument.

*Rhodes* predates *Bethea*. To the extent it held that the ABR could consider extrarecord matters in assessing guilt, it was overruled by *Bethea*.

*Strode* does not hold that information from the Article 32 investigation may be considered on appeal to determine guilt. The accused in *Strode* pled guilty to two sex offenses where the elements included knowledge that the victim was under the age of 16. He asserted that he had believed that she was over 16 when he committed the acts. In a footnote (n.3) the court gratuitously noted that the summarized statement of the OSI agent who interviewed the victim related that she looked more than 13 and could have been mistaken for a woman as much as 20 years of age. It observed that if admitted at trial, this statement would have been some support for the accused's position that he did not know the victim was not 16. It did not, however, rely on that statement to determine whether the accused's plea to committing indecent acts with a child under the age of 16 was improvident. Rather, it concluded that the accused's statement during the providency inquiry that he believed that she was more than 16 was inconsistent with the plea under Article 45, UCMJ, 10 USC § 845.

In *Hayes*, the Court of Military Review noted that it could consider a report of a Coast Guard investigator, admitted only at the Article 32, that the accused had asserted his right to counsel when confronted by an accusation of rape as a matter affecting his credibility. However, the holding of the court (by a bare majority of the sitting judges (3–2)) was grounded in the lack of credibility of the prosecutrix, largely her failure to complain promptly about the alleged rape. 40 MJ at 817. This is made very clear from the dissenting opinions that chastise the majority for its reliance on the lack of fresh complaint to conclude that the United States had not proven its case. Thus, *Hayes* does not provide support for appellant's argument, as reference to the Article 32 evidence was not required for the decision.*

---

* Moreover the Government did not seek review of the decision as it was grounded in a determination of fact.

Finally, it should be noted that in several cases, this Court has had the occasion to discuss the impact of *Bethea*. In each case we have concluded that matters outside the record of trial may not be considered. *See, e.g. United States v. Thompson*, 33 MJ 218, 222 n. 5 (1991)(evidence "raised during testimony of one witness during" the Article 32 investigation which "was never asserted during any testimony at trial ... cannot be considered"); *United States v. Harper*, 21 MJ 86 (1985)(government opposition to motion to attach and government motion to strike certain references in appellant's brief granted as information not included in record of trial). Therefore, appellant's argument that there is a split among the Courts of Criminal Appeals is incorrect.

## ISSUE III

■ The Eighth Amendment provides: "Excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted." The question presented is whether appellant's loss of retirement benefits as a result of his punitive discharge violates the Excessive Fines Clause of the Eighth Amendment. Appellant argues that his impending forfeiture of retirement pay is a direct result of the Government's punishment of him for a criminal offense and is therefore a fine under the Excessive Fines Clause. We disagree.

At the time of trial, appellant had 19 years and 3 months of active duty service in the Marine Corps. Appellant would have been eligible to retire at age 41. He calculated, in his Clemency Request of November 6, 1996, that with a life expectancy of 72 years, the anticipated lifelong retirement pay he could have expected to receive as a retired Captain with over 20 years of service exceeded $700,000.

The recent Supreme Court case of *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), applies the Excessive Fines Clause. There the Supreme Court noted: "This Court has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause." 524 U.S. at 327, 118 S.Ct. at 2033.

The offense of the accused in *Bajakajian* was attempting to leave the United States with $357,144 in currency, without reporting, as required by 31 USC § 5316(a)(1)(A), that he was transporting more then $10,000 in currency. The Government sought forfeiture of the $357,144 under 18 USC § 982(a)(1), which "provides that a person convicted of willfully violating" § 5316 "shall forfeit 'any property ... involved in such offense.' " 524 U.S. at 324, 118 S.Ct. at 2031. The Court noted that § 982(a)(1) "descends" from a "historical tradition" of *in personam*, criminal forfeitures, historically considered punitive, 524 U.S. at 332, 118 S.Ct. 2028, as opposed to "traditional civil *in rem* forfeitures," historically considered nonpunitive, *id.* at 331, 118 S.Ct. at 2035.

The Supreme Court, by way of a two-pronged analysis, first determined that there was a fine that fell within the Excessive Fines Clause and then determined that the fine was excessive. Because the forfeiture at issue in *Bajakajian* was a punitive criminal forfeiture, the Supreme Court noted: "The Excessive Fines Clause ... 'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense." ' " 524 U.S. at 328, 118 S.Ct. at 2033, quoting *Austin v. United States*, 509 U.S. 602, 609–610, 113 S.Ct. 2801, 2805, 125 L.Ed.2d 488 (1993)(emphasis deleted). The Court determined: "Forfeitures—payments in kind—are thus 'fines' if they constitute punishment for an offense." 524 U.S. at 328, 118 S.Ct. at 2033. After finding the forfeiture in that case to be a fine within the meaning of the Excessive Fines Clause, the Supreme Court then tested the fine to see whether it was "excessive." 524 U.S. at 334, 118 S.Ct. at 2036.

This Court touched on the Excessive Fines Clause in *United States v. Sumrall*, 45 MJ 207 (1996), although the issue cited the Due Process Clause rather than the Excessive Fines Clause. In looking at a "related constitutional issue also arising in this case," we did not state that the expected forfeiture of pay due to the dismissal in *Sumrall* was " 'an excessive fine' within the meaning of the Eighth Amendment[,]" but merely noted:

"We find no excessive or disproportionate forfeiture as prohibited by the Eighth Amendment in these circumstances." 45 MJ at 210.

In fact, the discussion in *Sumrall* is contrary to a determination that forfeiture of pay due to a dismissal is "an excessive fine" within the meaning of the Eighth Amendment. We stated in *Sumrall* that "there is no express authorization in the" UCMJ "or the Manual for Courts–Martial for the denial of retirement benefits." 45 MJ at 208. *Sumrall* also explains that the question whether a punitive discharge, such as a dismissal, might automatically trigger a loss of retirement benefits is a matter of statutory law and that the "decision to retire an officer in appellant's grade and time in service rests by statute with his service Secretary." *Id.* at 208–09.

Because the denial of retirement benefits is not found in the UCMJ or the Manual, such benefits have historically been considered by military courts to be a collateral consequence of a sentence and not properly part of that sentence. *See United States v. Lee*, 43 MJ 518, 520 (A.F.Ct.Crim.App.1995)(stating that "it is indisputable that it [loss of retirement benefits] is a *consequence* of the sentence and forms no part of the sentence itself" (emphasis in original)), *aff'd*, 46 MJ 123 (1996); *see also United States v. Quesinberry*, 12 USCMA 609, 612, 31 CMR 195, 198 (1962)(holding that the sentencing authority should concern himself "with the appropriateness" of the sentence "without regard to the collateral administrative effects of" a punitive discharge).

On the other hand, this Court has considered collateral matters, such as VA benefits and certain retirement considerations, to be relevant considerations on sentencing, but we have not held that collateral consequences constitute punishment. *See, e.g., United States v. Stargell*, 49 MJ 92, 93 (1998)("When, as in this case, an accused is 'knocking at retirement's door,' the impact of a punitive discharge on retirement benefits is not irrelevant or collateral."); *United States v. Becker*, 46 MJ 141, 144 (1997)(the "impact of a punitive discharge on the benefits for an accused who is within weeks of becoming retirement eligible are [sic] of no less importance than that for a soldier who is eligible to retire" and "[i]n both situations, the value of retired pay should be recognized as the single most important consideration in determining whether to adjudge a punitive discharge").

Nevertheless, historically, we have not found the loss of retirement benefits due to a punitive discharge to be punishment for an offense. Therefore, the first prong of the *Bajakajian* analysis fails because the loss of retirement benefits is not a fine within the meaning of the Excessive Fines Clause, so we need not reach the second prong, *i.e.*, a determination of excessiveness. At issue is a civilian statute, and the decision to retire an officer rests with his service Secretary, not with a court-martial.

█ The court below determined appellant's sentence to a dismissal was appropriate. Although the sentence seems severe for larceny of $145 and two false official statements, "[t]his Court has expressly refused to evaluate the appropriateness of individual court-martial sentences, particularly in those cases where the court below exercised its unique factfinding powers under Article 66, ..., and determined the sentence was correct in law and fact." *United States v. Maxwell*, 45 MJ 406, 427 (1996), quoting *United States v. Olinger*, 12 MJ 458, 460 (CMA 1982), citing *United States v. Dukes*, 5 MJ 71, 72–73 (CMA 1978).

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring):

With regard to Issue III, I agree with the majority but wish to note that I remain convinced that a new option should be added to the list of possible punishments that a court-martial may consider—a discharge with no or partial loss of retirement benefits. This new punishment option would allow better and more flexible justice in our military justice system. *See, e.g., United States v. Sumrall*, 45 MJ 207, 211 n. 3 (1996); *see* 45

MJ 211A and 211B (appendix to Sullivan, J., dissenting).

COX, Senior Judge (dissenting):

As the majority notes, there is strong circumstantial evidence to support a belief that appellant received a modem, took it, then set up an elaborate scheme to cover up his theft. However, in order to convict a servicemember of an offense, it is axiomatic that the Government must prove each and every element of that offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The elements of larceny are set out in Article 121, UCMJ, 10 USC § 921. Foremost among them is that the Government must prove that the accused took property "from the possession of the owner." There is no proof in the record, direct or circumstantial, that the Government was ever in possession of "the modem" allegedly stolen by appellant. Accordingly, no matter how suspicious the circumstances, the Government's proof of a larceny fails.