CORRECTED COPY – DESTROY ALL OTHERS

# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## First Lieutenant TIMOTHY R. SPIELMAN
## United States Air Force

### ACM 38285

### 1 August 2014

Sentence adjudged 28 September 2012 by GCM convened at Sheppard Air Force Base, Texas. Military Judge: J. Wesley Moore.

Approved Sentence: Dismissal and confinement for 1 year.

Appellate Counsel for the Appellant: Frank J. Spinner (civilian counsel) (argued) and Major Matthew T. King.

Appellate Counsel for the United States: Captain Thomas J. Alford (argued); Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; and Gerald R. Bruce, Esquire.

Before

MARKSTEINER, MITCHELL, and WEBER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

MITCHELL, Senior Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of aggravated sexual contact, abusive sexual contact, wrongful sexual contact, indecent exposure, indecent conduct, and assault upon a commissioned officer, in violation of Articles 120 and 128, UCMJ, 10 U.S.C. §§ 920, 928.[1] The adjudged and approved sentence consisted of a dismissal and confinement for 1 year.

---

[1] The appellant was acquitted of one specification of attempted forcible sodomy, in violation of Article 80, UCMJ, 10 U.S.C. § 880.

On appeal the appellant asserts two errors: (1) the evidence is legally and factually insufficient and (2) trial counsel's argument contained improper argument. At the request of the appellant, we heard oral argument on this case on 29 May 2014. Having reviewed the entire record of trial, the well-written briefs of counsel, and the issues addressed at oral argument, we affirm the approved findings and the sentence.

*Background*

The appellant was an Air Force Academy graduate who was enrolled as a student in pilot training at Sheppard Air Force Base, Texas. Both he and Lieutenant (Lt) RP were members of the same pilot training flight. They had limited interaction before the night of 2 December 2011, when the appellant's flight received an open invitation to Lt RP's house to watch television. About a dozen lieutenants responded to the invitation and showed up that night. Beer was served, and both the appellant and Lt RP drank alcohol. The two also shared a cigar. Lt RP was married at the time, but her husband was not present that night. The events that served as the basis for the charges all occurred after the other members of the flight left, leaving the appellant and Lt RP alone in her home.

Lt RP testified at trial under a grant of immunity. She explained that after everyone left her house, the appellant asked her to participate in photos of domination and submission, as he and a girlfriend liked to exchange such pictures. Lt RP declined to participate, but the appellant followed her into another room, took off his flight suit, and attempted to reassure her by saying, "That's not so bad." She told him to put his flight suit back on, but he instead took off his boxers, stating, "That just happened." She replied, "You've got to be kidding me." She did not feel threatened at this time, but thought the situation was extremely absurd. The appellant then propped up his phone facing Lt RP and crawled toward her. She kicked him away. She got up, picked up the appellant's clothes, and pushed them to him.

The appellant grabbed Lt RP's wrists and moved them toward his erect penis. When she tried to push him away, he put her hands on his buttocks. She forcibly told the appellant to get off of her and moved backwards, at which time the appellant apologized. He then clothed himself and returned to his phone. He flipped through his phone and noted his disappointment that they "didn't get anything," as if he had tried to record the interaction. She still did not feel threatened at this time but did believe the appellant had gone too far.

Lt RP offered to call a flight mate or cab to give the appellant a ride home. Instead, he again talked about his girlfriend and his desire for pictures with Lt RP. While talking about the pictures, the appellant started to touch himself over his flight suit. He then unzipped his flight suit, took out his erect penis, and began touching his penis in front of Lt RP in an up and down motion. The appellant asked Lt RP about his penis

size; she responded that it was small and he needed to put it away. Lt RP testified that by this point, she began to feel more uncomfortable with the appellant's behavior. The appellant got partially dressed and sat down but continued to seek Lt RP's approval regarding his penis size, which she gave "to try to get him to put everything away." He then asked if she wanted a closer look at his penis, to which she replied no. Undeterred, the appellant approached Lt RP and began thrusting his penis in her face. She told him to put it away and to get away then punched the appellant in his lower stomach. She stated that after his penis "brushe[d]" the side of her cheek, the appellant "kind of excitedly [asked], 'Did I get it in your mouth?'"

The appellant began to talk to Lt RP about sexual fantasies, including fantasies about rape and Lt RP being submissive. After she told him she was not submissive or into rape fantasies, he began to advance toward her, repeating, "I could rape you and kill you and nobody would know about it right now." At that point, the appellant grabbed her hands and pinned them to the couch. As she struggled against him, he grabbed her torso and fell to the floor with her. Lt RP was facedown and trying to push herself up, when the appellant wrapped his arm around her neck in a choke hold. She tried to break the hold with her hands, but the appellant did not let go until she repeatedly hit his arm. The appellant remained straddled over her as she flipped over in an attempt to get away. When Lt RP saw the appellant unzipping his flight suit, she punched him in the stomach, and he released her. She then forcibly told him to leave her house. The appellant began to apologize again, but told Lt RP she had been giving him "signals" all night long. The appellant then reached between Lt RP's legs and began rubbing her vagina through her jeans.

The appellant made an unsworn statement at the Article 32, UCMJ, 10 U.S.C. § 832, hearing. The Government counsel from the hearing testified at the court-martial about the appellant's unsworn statement. His testimony is summarized below:

> The appellant stated he had a few drinks at the Officers' Club before the party at Lt RP's home and about three beers at the party. He and Lt RP went outside to her backyard to smoke cigars and when they returned all the other guests had left. He wore his flight suit to the party and proceeded to remove it when he re-entered Lt RP's home. He was wearing a t-shirt, boxer shorts and gym shorts underneath the flight suit. He wore the gym shorts because it was cold. He removed his flight suit because he was hot and did not want to walk across base in his flight suit and draw the attention of Security Forces. Lt RP joked with him that he would be cooler if he took off all his clothes and after some bantering, he did. At that point, he became embarrassed because Lt RP laughed at him. She asked him a question about the craziest sexual thing he had done with a girl before. He related that he had taken naked photos to send to a girlfriend after she sent

him a photo of herself topless.  He then demonstrated his pose in one such picture for Lt RP by crawling toward her while he was naked.  Lt RP laughed at him again, so he retrieved his clothes, dressed and left.

Additional facts relevant to the disposition of the assigned errors are included below.

*Legal and Factual Sufficiency*

The appellant contends the evidence is legally and factually insufficient to support the findings of guilty.  He focuses on four perceived shortcomings in the Government's evidence:  prior inconsistent statements Lt RP made, her motive to misrepresent the events in question, phone records that contradict her account of when the charged events occurred, and other contradictory evidence.

We may affirm only those findings of guilty that we find are "correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c).  The test for legal sufficiency is, when the evidence is viewed in the light most favorable to the Government, whether a rational factfinder could have found the appellant guilty of all the elements of the offense beyond a reasonable doubt.  *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)).  "The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this Court] 'is convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Reed*, 54 M.J. at 41 (quoting *Turner*, 25 M.J. at 325).

We have examined all the appellant's proffered reasons for the alleged factual and legal insufficiency of the appellant's convictions, as well as conducting our own independent review of the record of trial.  Although we address only one of the issues, we are personally convinced of the appellant's guilt beyond a reasonable doubt and do not find the appellant's contentions persuasive.  The appellant argues that Lt RP's story is not credible because she would have been able to physically defend herself due to her extensive training in tae kwon do.[2]  Lt RP was a tae kwon do instructor, had reached the level of black belt, and was on her base tae kwon do team at a prior assignment.  When asked why she could not defend herself, she answered:

I mean, you think about it.  Like, "If somebody attacks me on the street, I could defend myself," or "I could totally take him."  It turns out no.  No, I

---

[2] Tae kwon do is a Korean martial art resembling karate.  *See Webster's Third New International Dictionary Unabridged* (2014), available at http://unabridged. merriam-webster.com (last visited 29 July 2014).

couldn't.  I don't know if it was me just being surprised or him being strong or what, but it turns out no, I can't.

We find her explanation and self-realization convincing.  Viewing the evidence in the light most favorable to the Government, we are convinced a rational factfinder could find beyond a reasonable doubt the appellant was guilty of the offenses.  Upon our own review of the evidence in the record of trial, we are personally convinced of the appellant's guilt beyond a reasonable doubt.

*Trial Counsel's Argument*

The appellant's next assignment of error alleges trial counsel made improper statements during argument.  Specifically, the appellant takes issue with three aspects of the argument:  (1) disparaging comments about trial defense counsel and the appellant; (2) improper vouching for the Government witnesses; and (3) improper personal commentary on the evidence and injection of trial counsel's personal beliefs.

Disparaging Comments

Whether argument is improper is a question of law we review de novo. *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citing *United States v. Pope*, 69 M.J. 328, 334 (C.A.A.F. 2011)).  Because trial defense counsel failed to object at trial, we review the issue for plain error.  *See United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007); *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001).  To prevail under a plain error analysis, the appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right [of the appellant]."  *Erickson*, 65 M.J. at 223 (quoting *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)).  We find that trial counsel's argument did not amount to plain error.

"A trial counsel is charged with being a zealous advocate for the Government." *United States v. Barrazamartinez*, 58 M.J. 173, 176 (C.A.A.F. 2003).  As a zealous advocate, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence."  *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000).  During argument "trial counsel is at liberty to strike hard, but not foul, blows."  *Baer*, 53 M.J. at 237.  Accordingly, trial counsel may not: "unduly . . . inflame the passions or prejudices of the court members," *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983); inject personal opinions, facts not in evidence, or other irrelevant matters, *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007); invite punishment for uncharged misconduct, *Id.*; comment upon the accused's exercise of his or her constitutionally protected rights, *United States v. Paxton*, 64 M.J. 484, 487 (C.A.A.F. 2007); or treat an accused's duty position as a matter in aggravation absent a connection between the member's position and the offense, *United States v. Bobby*, 61 M.J. 750, 755 (A.F. Ct. Crim. App. 2005).  Stated conversely, trial counsel is limited

to arguing the evidence in the record and the inferences fairly derived from that evidence. *See Paxton*, 64 M.J. at 488; *United States v. White*, 36 M.J. 306, 308 (C.M.A. 1993).

The appellant argues that trial counsel made disparaging comments about trial defense counsel when he commented on how the appellant's unsworn statement at the Article 32, UCMJ, hearing was only in response to questioning from his trial defense counsel. However, this was merely comment on the evidence introduced at trial. We do not view this comment as nefarious, but advocacy—common to trial counsel. Trial counsel commented on the fact that the appellant made a prior statement and was not subject to cross-examination. This is not the same as disparaging trial defense counsel by suggesting that the defense was fabricated by the counsel. *See United States v. Fletcher*, 62 M.J. 175, 182 (C.A.A.F. 2005). In this case, the argument of trial counsel was well within bounds, based on the evidence in the record, fairly derived from that evidence, and did not improperly personally vouch for the evidence. We conclude that trial counsel's argument was not plain error.

The appellant next argues that trial counsel disparaged him by calling him a liar. However, trial counsel never called the appellant a liar; instead he referred to the appellant's statements as lies. For example, trial counsel argued, "What does not make sense, what is not corroborated, what is not supported in the evidence, what's a lie, what's a fabrication, what is self-serving is [the appellant's] ever-shifting account of what happened that night," and "[h]e lied to match the evidence." It is appropriate for a trial counsel to comment on an appellant's conflicting testimony; impropriety occurs when trial counsel uses "language that [is] more of a personal attack on the defendant than a commentary on the evidence." *Fletcher*, 62 M.J. at 183. In a case such as this, where Lt RP's testimony about the events was pitted against the previous statements the appellant made, trial counsel has some leeway to point out the lack of credibility in an accused's account. We find trial counsel appropriately argued the plausibility of the appellant's statements and did not "cross the 'exceedingly fine line which distinguishes permissible advocacy from improper excess.'" *Id.* (quoting *United States v. White*, 486 F.2d 204, 207 (2d Cir. 1973)). We conclude that trial counsel's argument was not plain error.

## Vouching and Personal Commentary

Next, we examine the appellant's contention that trial counsel improperly vouched for the Government's witnesses and evidence and offered improper personal commentary. "[I]mproper vouching occurs when the trial counsel 'plac[es] the prestige of the government behind a witness through personal assurances of the witness's veracity.'" *Id.* at 180 (alteration in original) (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). This "can include the use of personal pronouns in connection with assertion that a witness was correct or to be believed." *Id.* In our review of the 43 pages of trial counsel's findings argument, we find three instances, close in time

to each other, when trial counsel used personal pronouns in a way that could be construed as vouching for a witness.[3] This stands in marked contrast to *Fletcher*, where trial counsel's argument amounted to plain error when, on more than two dozen occasions, she offered personal commentary on the veracity of the testimony and evidence, and "[s]he repeatedly inserted herself into the proceedings by using the pronouns 'I' and 'we.'" *See Fletcher*, 62 M.J. at 181. We distinguish those facts from the minimal references by trial counsel to his personal opinion in this case. We find that these de minimus references to his personal opinion did not amount to plain error.

Having reviewed the entirety of the record, we are confident the members convicted the appellant on the basis of the evidence alone. *See Id.* at 184. Trial counsel's argument was generally appropriate, and any possible deviations from the limits of appropriate argument did not result in "a failure to observe that fundamental fairness essential to the very concept of justice." *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (internal quotation marks and citation omitted).

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are

AFFIRMED.

Senior Judge MARKSTEINER participated in this decision prior to his reassignment.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

---

[3] The comments are: "The incredible candidness [of Lt RP] there on the court at least by my perception"; "What you have heard in this case is one consistent account [from Lt RP]. . . . Isn't it telling members, that when she has this inconsistent [sic] statement to people . . . [it is to mandatory reporters]. . . . I think it is"; and "And that's [referencing a discrepancy raised by the defense] a small point; it's a fine detail. Perhaps you members care about it, perhaps you don't. I don't think you want to give it too much emphasis and here's why: It's easy to misunderstand that point; right?"