# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40442 (f rev)**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Nicholas J. MOORE**
Airman (E-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 13 November 2024

————————————

*Military Judge*: Colin P. Eichenberger; Dayle P. Percle (post-trial processing and remand).

*Sentence*: Sentence adjudged 13 January 2023 by GCM convened at Hill Air Force Base, Utah. Sentence entered by military judge on 8 March 2023: Dishonorable discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Matthew L. Blyth, USAF.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Vanessa Bairos, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and KEARLEY, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Judge GRUEN and Judge KEARLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. On 25 January 2023, Appellant requested that the convening authority waive all automatic forfeitures, and disapprove the adjudged reduction in rank and adjudged forfeitures. On 10 February 2023, the convening authority denied Appellant's waiver request, took no action on the findings, and approved the sentence in its entirety.

Appellant's appeal was docketed with this court on 4 April 2023. Subsequently, on 21 March 2024, this court remanded Appellant's case to the Chief Trial Judge of the Air Force Trial Judiciary for correction of the record, specifically to address items in the record which were discovered missing during our initial review. *United States v. Moore*, No. ACM 40442, 2024 CCA LEXIS 118, at *2–3 (A.F. Ct. Crim. App. 21 Mar. 2024) (order). On 19 April 2024, Appellant's case was redocketed with this court.

On 19 April 2024, Appellant submitted his brief to the court. Appellant raises seven issues on appeal, which we have rephrased: (1) whether Appellant's conviction is factually sufficient; (2) whether the military judge abused his discretion in admitting evidence under Mil. R. Evid. 413; (3) whether trial counsel committed prosecutorial misconduct during closing argument; (4) whether Appellant's due process[2] rights were violated because he was convicted of a theory of criminality not on the charge sheet; (5) whether Appellant was denied his right to a unanimous verdict; (6) whether 18 U.S.C. § 922 is constitutional as applied to Appellant; and (7) whether Appellant's conviction is legally sufficient.[3],[4]

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] U.S. CONST. amend. V.

[3] Issues (5), (6), and (7) were personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] On 17 May 2024, Appellant moved this court to file an additional *Grostefon* issue, which Appellant titled as issue (8) to correspond with matters he raised in his initial brief. On 31 May 2024, we denied Appellant's motion for leave to file the supplemental issue because Appellant did not demonstrate good cause for why the issue was not raised in his initial brief to this court.

We have carefully considered issues (1), (4), and (7) together. We agree with Appellant and find the evidence in the record does not support legal or factual sufficiency and set aside the sole charge and specification of conviction. Therefor we need not address the remaining issues.

## I. BACKGROUND

On 8 February 2022, Appellant and three friends made dinner together after work. The dinner party included Appellant, Airman First Class (A1C) KA, and Senior Airman (SrA) BM—all male servicemembers—and AB, a female servicemember. The group arrived at AB's dormitory room at approximately 2000 hours. The four friends socialized, ate dinner, and watched television in AB's room for approximately one hour after dinner. At approximately 2200 hours, A1C KA and SrA BM left for the evening, while Appellant stayed and continued to watch television with AB.

Appellant and AB sat next to each other on AB's small couch. At some point Appellant ended up sitting sideways on the couch with his legs over AB's lap. AB was wearing sweatpants, a tank top, a bra, and underwear. Shortly thereafter, AB fell asleep. AB awoke to a sensation of having to urinate, but soon realized that the sensation she felt was Appellant's finger inside her vagina. AB then "realized" that her top and bra were removed, and her sweatpants were pulled down to her thighs. As AB described at trial, when she awoke, she was lying fully horizontal on her right side facing the back of the couch. She explained that Appellant was behind her and "had his right arm kind of wrapped around [her] chest area, and his left arm was more behind [her]." AB stated that Appellant's hand was underneath and between her legs and that she felt Appellant's fingers inside her vagina. Appellant was also biting or kissing her left ear as she awoke.

Once AB realized what was happening, she pushed Appellant off, and yelled at him, "What the f[*]ck are you doing?" Appellant responded by saying, "You're right, you're right." AB then asked Appellant to leave, and Appellant asked if they could discuss what happened in the morning. AB asked him to leave again, and Appellant complied. During the exchange, AB noticed that Appellant had his pants off with his underwear still on. AB further noticed her bra and tank top were on the floor. As soon as Appellant left, AB threw on a "hoodie" and called SrA BM while she ran to SrA BM's dorm room, which was in the same building. When AB arrived at SrA BM's room, AB was not wearing shoes or socks.

SrA BM testified that he had a hard time understanding AB on the phone call because she was upset, confused, very emotional, and crying. When SrA BM answered the door, he hugged AB and asked her what was wrong. SrA BM stated AB told him that she had fallen asleep on the couch and when she awoke

her shirt and bra were removed and Appellant was touching her. SrA BM immediately called the Sexual Assault Prevention Response (SAPR) office. A short while later, SrA BM escorted AB to her room to retrieve extra clothes and then drove AB to a medical clinic, where a sexual assault examination was performed.

AB returned to her dorm room at approximately 0300 hours, and attempted, unsuccessfully, to phone her boyfriend. At 0715 hours, AB reported to work, and immediately went to speak with her flight chief, Master Sergeant (MSgt) RS. AB then informed MSgt RS that she wanted to file an unrestricted sexual assault report, at which point MSgt RS brought in the first sergeant. A short while later AB was taken to the Air Force Office of Special Investigations (OSI) for an interview. At approximately 1600 hours, while still at OSI, AB sent Appellant a message on a social media application. The message read:

> I don't understand how you could do that, I fell asleep on the couch, I thought I could trust you [N]ick. Wtf I shouldn't have to worry about you taking my shirt off and putting your hand down my pants. I don't understand what you were thinking, I really thought I could trust you [N]ick[.]

By the time Appellant responded—at 1811 hours—AB had left OSI. AB's first sergeant had secured a room for her in lodging, since Appellant and AB lived in the same dorm building. Appellant responded, "I don't know what I was thinking either. I know an apology won't be enough." AB never spoke or communicated with Appellant again. Subsequently, AB requested and received an expedited transfer to a new duty location, that was closer to and about two hours from CW, her boyfriend, whom she had known since high school, and who was serving in another branch of military service.

Appellant was charged and convicted of one specification of sexual assault without consent.

## II. DISCUSSION

In his appeal, Appellant challenges the legal and factual sufficiency of his sexual assault conviction. Specifically, Appellant argues that his conviction was legally insufficient because the Government violated his due process rights by conflating two different theories of criminal liability under Article 120, UCMJ, during his court martial. For the reasons set forth *infra* we agree.

### A. Additional Background

#### 1. AB's Sleeping Habits

At Appellant's court-martial, the Government questioned AB regarding her sleep habits. In general, AB described herself as a "heavy sleeper." During

cross-examination, AB acknowledged there were times in the past when she had conversations with people when she was half-asleep, and she did not remember those conversations the next day. When asked, "It's possible that on the night in question you had a conversation with [Appellant] in a half-asleep state?" AB responded, "Yes, ma'am." When Appellant's trial defense counsel then asked, "It's possible that during that conversation, he asked for consent?" AB responded, "I was sleeping, ma'am."

CW also testified regarding AB's sleeping habits. On cross-examination, CW agreed that AB would talk and mumble when she was close to falling asleep. CW also confirmed that in his initial interview with OSI, he told investigators that AB would wake up when there was movement, when shaken at a movie theater, or shaken on her shoulder, and that she would randomly wake up during the night. When asked on redirect examination about AB's sleeping habits, CW said she was a "heavy sleeper," adding that he would play heavy metal music very loud because he was hard of hearing, and she would not wake up. At movie theaters, CW said AB would "sleep through entire movies." He further testified that during his initial OSI interview, he told the investigators that AB would fall asleep in movie theaters. However, CW said that while he did tell OSI that she would sometimes wake up during the movie, he also told OSI that she would usually fall right back asleep.

CW continued regarding AB's sleeping habits:

> Like, flashing lights from movies, again, she won't wake up to that normally. I could be, like, on social media on my phone with us cuddling and she won't wake up. And I'll have to, like, move to use the restroom and she'll do, like, a little, like, groggy wake up, and then fall back asleep immediately.

Regarding her talking as she falls asleep, CW said, "I won't say sleep talking, but, like, as she's falling asleep, she'll talk to me and not remember what she's talking about in the morning." When asked if he "had ever had any real important or substantive conversations about something" that AB did not remember in the morning, CW said, "No." He said the kinds of things AB would talk about included "like, lovey-dovey stuff, like going on dates and such, and ideas, and then I'd be showing her memes and other funny videos on my phone, and she would not remember at all." CW agreed that this talk would all occur as she was going to sleep, but responded, "No," when asked, "Has she ever actually in her sleep, that you know of, sleep talked to you?"

### 2. AB's Initial Reporting

SrA BM testified that he never observed AB flirt with Appellant or perceived any sort of romantic relationship between them. On the night in question, SrA BM said the group was watching *The Mandalorian* in AB's dorm

room. SrA BM said when he left, he went straight to his dorm room and went to sleep. The next thing he knew, SrA BM woke up to a panicked and out of breath AB on the phone. He said he could not make out much because of her panicked state but she eventually formed the sentence, "I'm coming up there." When SrA BM let AB into his room, he described AB's state as "very flustered," her face was red, and he could tell "she had been crying." SrA BM testified that AB told him that she fell asleep and when she woke up "she had her pants down but not off, and he had his fingers inside of her."

SrA BM told AB they could either call SAPR or the first sergeant and that they decided to call the SAPR hotline. SrA BM said he drove AB to the clinic and then back to the dorms. The next morning, SrA BM drove AB to work and the two went to the flight chief's office. On redirect examination, SrA BM answered, "Yes, sir," when asked if he remembered telling OSI that AB told him she had fallen asleep on the couch. He also stated that while he told OSI that AB said her pants were removed, he said the word "completely" was not used.

During Appellant's court-martial, A1C AS, AB's roommate, testified that she was awoken on the night of 8 February 2022 by AB crying. A1C AS said, "I woke up to the sound of [AB] crying, and I heard her leave. I heard the front door open." A few days later, A1C AS said AB told her that she had fallen asleep on the couch in her room and she awoke to Appellant trying to "put it in her while she was sleeping." A1C AS said AB did not clarify whether "it" meant Appellant's penis or fingers.

MSgt RS also testified that on the morning of 9 February 2022, AB and SrA BM came to his office. He said that both were "visibly distraught," and that AB looked "as if she had been crying in the past." Once he realized what the two were talking about in that there may have been a sexual assault, he stopped them and made sure they knew the difference between a restricted and unrestricted report. Once AB wanted to proceed, MSgt RS included the first sergeant so that AB did not have to "recount it multiple times." MSgt RS further testified AB told him that she was in her dorm room, she fell asleep, and awoke with Appellant on top of her. MSgt RS said he did not pry for details.

CW testified he missed multiple phone calls from AB in the early morning hours of 9 February 2022. When they did talk, AB told him that "she woke up to someone touching her inappropriately and proceeding to try to do more." CW said the couple were not having any relationship problems at the time. Though they were not dating at the time of Appellant's court-martial, CW said it had nothing to do with the case.

**B. Law**

We review issues of legal sufficiency de novo. *United States v. Harrington,* 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King,* 78 M.J. 218, 221

(C.A.A.F. 2019)). Our assessment of legal sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017), (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, ___ M.J.___, No. 23-0210, 2024 CAAF LEXIS 590, at *9 (C.A.A.F. 7 Oct. 2024) (internal quotation marks and citation omitted).

The National Defense Authorization Act for Fiscal Year 2021 significantly changed how Courts of Criminal Appeals (CCAs) conduct factual sufficiency reviews. Pub. L. No. 116-283, § 542(b)(1)(B), 134 Stat. 3388, 3612 (1 Jan. 2021). Previously, the test for factual sufficiency required the court, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, to be convinced of the appellant's guilt beyond a reasonable doubt before it could affirm a finding. *See United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). "In conducting this unique appellate role, we [took] 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (second alteration in original) (quoting *Washington,* 57 M.J. at 399) (applying the version of Article 66(c), UCMJ, in effect prior to 2019; *see also United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *Wheeler* and applying the same factual sufficiency test in the context of Article 66(d), UCMJ, effective 1 January 2019).

The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

(i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

(ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B).

"[T]he requirement of 'appropriate deference' when a CCA 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *United States v. Harvey*, ___ M.J.___, No. 23-0239, 2024 CAAF LEXIS 502, at *8 (C.A.A.F. 6 Sep. 2024) (second and third alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at *10 (internal quotation marks omitted).

In order for this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at *12. First, we must decide that evidence, as we weighed it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

As charged, Appellant was convicted of sexual assault without consent, in violation of Article 120(b)(2)(A), UCMJ, which required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon AB by penetrating her vulva with his finger, with an intent to gratify his sexual desire; and (2) that Appellant did so without AB's consent. *Manual for Courts-Martial, United States* (2019 ed.) *(MCM)*, pt. IV, ¶¶ 60.a.(b)(2)(A), (g)(1).

"'[C]onsent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "A sleeping . . . person cannot consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(B). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C). "The burden is on the actor to obtain consent rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019).

As our superior court has recently affirmed, "Article 120(b), UCMJ, criminalizes sexual assault in the military and defines multiple ways in which the Government may prove the offense." *Mendoza*, 2024 CAAF LEXIS 590, at *12.

Relevant to this case, Article 120(b), UCMJ, provides, that "[a]ny person subject to this chapter who . . . (2) commits a sexual act upon another person—(A) without the consent of the other person; or (B) when the person knows or reasonably should know that the other person is asleep, unconscious, or otherwise unaware that the sexual act is occurring; . . . is guilty of sexual assault and shall be punished as a court-martial may direct." 10 U.S.C. § 920(b); *see also MCM*, pt. IV, ¶ 60.a.(b).

However, Article 120(b)(2)(A), UCMJ (without consent), and Article 120(b)(2)(B), UCMJ (while asleep), establish separate theories of liability. Our superior court's decision in *Mendoza* held that the Government cannot "charge one offense under one factual theory and then argue a different offense and a different factual theory at trial" without violating Appellant's constitutional rights. 2024 CAAF LEXIS 590, at *18 (citation omitted). Accordingly, to convict Appellant under a lack of consent theory the Government was required to show the victim was capable of consenting but did not. *Id.* at *20–21.

**C. Analysis**

Viewing this evidence in the light most favorable to the Prosecution and drawing every reasonable inference from the evidence of record in favor of the Prosecution, we find Appellant's conviction legally insufficient because the Government in this case charged Appellant under one factual theory—sexual assault without consent (from a person capable of consenting)—and then proved the charged offense on a different factual theory—sexual assault when Appellant knew or should have known that the victim was asleep. After reviewing the totality of the record of trial, we cannot conclude any rational trier of fact could have found the essential elements of the crime as charged beyond a reasonable doubt. Here, the Government offered no evidence that AB was capable of consenting and did not consent. Instead, the Government's evidence presented during Appellant's court-martial was limited to the fact that AB was asleep, and therefore not capable of consenting when the sexual act occurred.

This included testimony from multiple witnesses regarding AB's sleep habits. Moreover, the Government's closing argument was solely focused on the fact that AB was incapable of consenting because she was a "heavy sleeper" and was asleep while the sexual act occurred. For these reasons, we conclude Appellant's conviction for sexual assault is not legally sufficient. Additionally, for the same reasons, after giving the appropriate deference to the factfinder, we are also clearly convinced the findings of guilty are against the weight of the evidence and therefore factually insufficient as well. *Harvey*, 2024 CAAF LEXIS 502, at \*12.

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. The charge and its specification are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property, of which Appellant has been deprived by virtue of the findings and sentence set aside by this decision, are ordered restored. *See* Articles 58b(c) and 75(a), UCMJ, 10 U.S.C. §§ 858b(c), 875(a).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court