**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman First Class PAULO D. WALTERS**
**United States Air Force**

**ACM 38516**

**13 July 2015**

Sentence adjudged 17 August 2013 by GCM convened at Goodfellow Air Force Base, Texas. Military Judge: Joseph S. Kiefer.

Approved Sentence: Bad-conduct discharge, confinement for 4 years, and reduction to E-1.

Appellate Counsel for the Appellant: Major Jeffrey A. Davis and Major Christopher D. James.

Appellate Counsel for the United States: Major Roberto Ramirez and Gerald R. Bruce, Esquire.

Before

ALLRED, HECKER, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

TELLER, Judge:

The appellant was convicted, contrary to his pleas, by a panel of officer and enlisted members, of rape in violation of Article 120, UCMJ, 10 U.S.C. § 920. The court sentenced him to a bad-conduct discharge, four years' confinement, and reduction to E-1. The sentence was approved as adjudged.

The appellant argues that the evidence was legally and factually insufficient to sustain his conviction and that the military judge erred by failing to abate the proceedings

after Facebook refused to produce records as ordered by the trial court. Finding no error that materially prejudices a substantial right of the appellant, we affirm the findings and sentence.

*Background*

The appellant and the victim, Airman First Class (A1C) EO, both students at Goodfellow Air Force Base (AFB), Texas, knew each other but did not have any kind of relationship.[*] The night of 25 August 2012 there was a card tournament at an on-base venue that both Airmen attended. The tournament ended at about midnight.

After the tournament, a group of Airmen, including the appellant and A1C EO, went to another location on-base hoping to continue the game. When they found out that location had closed, the appellant, his recently arrived roommate (A1C MW), and A1C EO, decided to continue the game in the appellant's room. As they were walking back to the dormitory, the subject of alcohol came up, with the appellant offering to share some vodka he had in the room and A1C EO deciding to pick up some beer she had left at a friend's nearby room. A1C EO then joined the other two Airmen in the appellant's room.

Soon after they arrived, the appellant poured the first round of drinks to toast the new friendship. The drinks consisted of straight vodka in plastic drinking cups approximately six inches tall. Over the course of the next two to three hours, the Airmen continued to play the card game and drink. A1C EO also had a beer she sipped as a chaser for the straight vodka. At one time prior to joining the Air Force, A1C EO had been a heavy drinker, admitting that on 20–30 occasions she had episodes of alcohol induced memory loss, which she described as blackouts. But while at Goodfellow AFB, she deliberately moderated her consumption. About 45 minutes into the game, the appellant poured the second round of drinks. A1C EO noticed that the second drink had more than what she considered a single shot, and she confronted the appellant, saying, "When I ask for a shot I meant a shot." About 30 minutes later the appellant offered A1C EO another shot, but she declined. After another 30 minutes, the appellant offered again, and A1C EO accepted. This drink, like the previous one, was more than a single shot.

The group continued to play, but A1C EO had no recollection of the events which occurred after the third drink of vodka and before she awoke in the midst of the assault. A1C MW, who was also drinking, remembered more of those events, albeit imperfectly. He recalled the appellant complimenting A1C EO and her giving the appellant a flirtatious smile, which A1C EO did not remember. He said that as the night progressed, they had another round of liquor. While the timing is unclear, at one point while they

---

[*] The appellant and Airman First Class (A1C) EO were students at the Defense Language Institute at the same time prior to their arrival at Goodfellow Air Force Base but had never spent any time together.

were all sitting on the floor, the appellant leaned over to A1C MW and whispered softly enough that A1C EO would not hear, "[G]et ready to go to sleep, because she's clearly gone bro" or words to that effect.

A1C MW later noticed A1C EO leaning back against the bedpost of his bed. He tried to rouse her, but she only muttered something unintelligible in response. At that point, the appellant pushed A1C MW away and guided A1C EO across the room to his own bed. As he did so, A1C EO said "no, no—his bed, his bed," pointing back towards A1C MW's bed, against which she had been leaning. When A1C MW told the appellant that A1C EO should sleep wherever she wanted to or go back to her own room, the appellant told A1C EO, "If you want to stay here tonight then this is how it is going to be," as he laid her on his bed. A1C MW went over to check on A1C EO but again could only get her to mutter in response. At that point, the appellant told A1C MW that he should go lie down, watch a movie, or go to sleep. After initially lying down on the bed next to A1C EO, the appellant then got up and hung a blanket over the footboard of A1C MW's bed, obscuring A1C MW's view. A1C MW fell asleep shortly after that.

Upon waking in the appellant's bed, A1C EO's awareness of her surroundings recovered quickly, although it took her longer to regain control of her movements. She awoke to the sense that someone was on top of her and having sex with her, but she wasn't able to open her eyes to see who it was. She spent the next few moments trying to recall and ascertain her surroundings. Remembering she had been in the appellant's room, she regained more control over her movements and opened her eyes and determined that the silhouette on top of her was the appellant. She wanted to push the appellant off but could only feebly extend her arms against him. At that point the appellant pushed down with his chest and pinned her arms against her breasts while continuing to have sex with her. At some point, the appellant began kissing her breasts, looking up at her and trying to establish eye contact. A1C EO could now clearly see her assailant's face and recognized him as the appellant. As the appellant continued to have sex with her, A1C EO formulated another plan to push her thumbs into the sensitive flesh just above the appellant's iliac crest, a technique she knew from self-defense classes. When she executed that technique, the appellant pulled back, terminating the sexual contact. A1C EO rushed to put her pants on and ran out of the room, leaving behind her underwear and other personal belongings.

Awakened by the commotion, A1C MW saw A1C EO flee the room and was the first to talk to the appellant. When he asked the appellant what happened, the appellant told him

> Nothing. Okay? As far as you're concerned I was on the bed watching the film and she woke up, looked around, looked startled and grabbed her—ran across the room without her pants on that I was trying to give back to her along with all

> her—her ID and everything and then ran down the hall to that
> other room and that's all you saw.

or words to that effect. The appellant went on to talk about how important his marriage was to him and then told A1C MW, "[F]emales always win in cases like this regardless of what happened so I need to know that you . . . have my back in all this."

Meanwhile, A1C EO ran to a nearby friend's room seeking help. Her friend let her in, and after unsuccessfully trying to contact the first sergeant, contacted the Sexual Assault Response Coordinator (SARC). Her friend escorted her to the SARC's office, where agents from the Air Force Office of Special Investigations met her. A sexual assault examination was done at a nearby civilian facility. The parties stipulated that the DNA from that examination matched the appellant.

*Factual and Legal Sufficiency*

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). "The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses,' [we are] 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *Turner*, 25 M.J. at 325).

The single specification in the case alleged that the appellant committed a sexual act upon A1C EO "by using unlawful force, to wit: pressing his body against [A1C EO's] body." As alleged, the offense has two elements: (1) that at or near Goodfellow AFB, Texas, on or about 26 August 2012, the accused committed a sexual act upon A1C EO, to wit: penetrating her vulva with his penis; and (2) that he did so by using unlawful force against A1C EO, to wit: pressing his body against A1C EO's body. The appellant does not contend that the sexual act did not occur but contests the second element, the use of unlawful force. Specifically, the appellant argues that the prosecution failed to prove that the appellant raped A1C EO, "by using physical strength or violence that was sufficient to overcome, restrain, or injure A1C EO, such that she was coerced or compelled to submit to the sex act."

Force and unlawful force have related definitions under Article 120, UCMJ. Unlawful force is defined in Article 120(g)(6) as "an act of force done without legal justification or excuse." 10 U.S.C. § 920. Force is defined in Article 120(g)(5) as: "(A) the use of a weapon; (B) the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or (C) inflicting physical harm sufficient to

coerce or compel submission by the victim." There was no evidence in this case that the appellant used a weapon. Subsection (B) establishes an objective standard for force while subsection (C) establishes a standard of force related to the victim's subjective state of mind, including a vulnerable victim with a disability that makes that person more easily coerced or compelled than the average person. *See* Jim Clark, *Professor Jim Clark on Analysis of Crimes and Defenses 2012 UCMJ Article 120, Effective 28 June 2012*, 2012 EMERGING ISSUES 6423 (2012). Physical harm is not defined in the statute, but bodily harm is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." 10 U.S.C. § 920(g)(3). We construe physical harm in this context to be coextensive with the definition for bodily harm.

When viewed in the light most favorable to the prosecution, there is sufficient evidence to sustain the conviction. A1C EO testified that, upon trying to push the appellant away, the appellant pressed against her with his chest, pinning her arms, while he continued to have sex with her, and that she was unable to resist further. The bodily contact of pressing his chest against A1C EO's arms, pinning them to her chest, was sufficient according to her testimony to overcome her efforts to resist, compelling her to submit to the ongoing unwelcome sexual act. Under previous versions of Article 120, UCMJ, the standard would have required the prosecution to show force "sufficient that the other person could not avoid or escape the sexual conduct." *Manual for Courts-Martial, United States* (*MCM*), A28-3, ¶ 45.a.(t)(5)(C) (2012 ed.). Under the current definition of force, the prosecution need only show physical harm sufficient to compel the victim's submission. The evidence is sufficient to prove the second element of the offense under that standard.

After making allowances for not personally observing the witnesses, we are also convinced of the appellant's guilt beyond a reasonable doubt. We do not doubt that the appellant pressed his body against A1C EO with sufficient force to pin her arms against her chest. However, A1C EO's lack of awareness prior to that event requires that we evaluate the surrounding circumstances to determine whether that contact caused her submission. The appellant's pre-assault and post-assault conduct indicates that even he did not believe A1C EO consented. The appellant carried her to his bed, despite her protests that she wanted to sleep in A1C MW's bed. He commented on her degree of intoxication to A1C MW. After the assault, he told his roommate females always win these cases and that he needed to know his roommate "had his back." Such conduct is inconsistent with the theory that A1C EO consented but simply does not remember consenting. Instead we find that her submission to intercourse during the period shortly after she regained awareness was caused by the appellant holding her down with his bodyweight against her arms. We find the conviction factually sufficient.

After the assault, A1C EO made comments related to the assault on her Facebook page, which the appellant argued were probative of her motive and credibility in making and sustaining the allegations. The defense had obtained certain posts prior to trial from A1C EO's public Facebook postings where she expressed her frustration with the trial process and asserting, "Air Force you are trying really hard to make me hate you. I am going to try one more diplomatic approach before I join the ranks of the disgruntled." Based on these public posts, the defense sought production of all of A1C EO's Facebook records. The military judge issued two orders to Facebook to produce the records, but Facebook refused to comply. Additional discussions with Facebook indicated that they would comply with a subpoena from the United States Attorney's Office. However, the personnel from that office said they could not subpoena the records because the request was not seeking evidence of a crime.

As an alternative, A1C EO agreed to turn over her username and password to the military judge. The military judge undertook his own review of A1C EO's Facebook page to identify any relevant material. In his review, the military judge reviewed all of the postings on A1C EO's private Facebook page from approximately 30 days prior to the assault through the time of trial. He provided the defense with those messages he found relevant. He noted that any content on A1C EO's public page was not part of his review since they were accessible to the defense. The military judge also made a finding regarding the completeness of his review, stating, "I don't have evidence that there's a bunch of stuff that is now missing. [I don't] have evidence of that."

The appellant now asserts that the military judge abused his discretion by denying the appellant's request to abate the proceedings until Facebook complied with the military judge's discovery order to produce A1C EO's Facebook records.

We review a military judge's decision to abate a court-martial based on a discovery issue for abuse of discretion. *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001); *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004); *United States v. Bowser*, 73 M.J. 889, 895 (A.F. Ct. Crim. App. 2014). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010). We will not overturn a military judge's ruling unless it is "'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous,'" *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)), or influenced by an erroneous view of the law. *Id.* (citing *Humpherys*, 57 M.J. at 90).

Parties to a court-martial are entitled to an "equal opportunity to obtain witnesses and other evidence." Article 46 UCMJ, 10 U.S.C. § 846. This includes the right to

compulsory process. Rule for Courts-Martial (R.C.M.) 703(a). "Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(1). Mil. R. Evid. 401 defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is "necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." R.C.M. 703(f)(1), Discussion. The burden of persuasion on a motion for appropriate relief is on the moving party. R.C.M. 905(c)(2)(A), 906(b)(7).

We begin with the premise that Article 46, UCMJ, and R.C.M. 703 entitle parties to a court-martial to equal access to evidence, not a particular mode of obtaining that evidence. The appellant requested production of A1C EO's Facebook records on the basis of messages she had posted on her public Facebook page. While the appellant's initial motion at trial sought "messages, status postings, image uploads, and chat logs," there was no evidence presented at trial of the existence of records other than those available through A1C EO's public or private page. The appellant, as the moving party, bore the burden of establishing the existence of any evidence he sought to be produced. We accordingly limit our analysis to access to content on A1C EO's Facebook page.

After Facebook refused to comply with his production order, the military judge laudably sought other avenues for obtaining that evidence. After some inquiry, A1C EO agreed to provide her username and password to the military judge so he could conduct an in camera review of her Facebook page. Such reviews are authorized "[t]o ensure a good balance between an accused's right to a fair trial, judicial efficiency, and confidentiality considerations." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999). After some initial difficulty, base communications personnel were able to assist the military judge in producing a complete record of A1C EO's Facebook page since her arrival at Goodfellow AFB and through the time of trial. The military judge reviewed that material and released nine messages to the defense as responsive to their request. While this review was incomplete at the time of the defense request for abatement, it was complete prior to opening statements. The appellant did not request a continuance to review the records prior to opening statements.

The appellant's assignment of errors does not assert that the failure to abate the proceedings hampered his ability to prepare for trial or assert a defense. Instead, he suggests that the military judge's failure to enforce his production order, without more, was an abuse of discretion.

The military judge's decision not to abate the proceedings while he pursued other avenues of obtaining the evidence was not arbitrary, fanciful, clearly unreasonable, or clearly erroneous. At the time of the request, the military judge had begun his in camera review and reasonably believed he would be able to review all of A1C EO's messages

from the relevant timeframe. The evidence was in fact provided to the appellant prior to opening statements. The evidence was not burdensome to review, and the defense did not request a continuance. The military judge's decision was not an abuse of discretion.

Even if we found that the decision not to abate was erroneous, we would still find that it did not materially prejudice a substantial right of the appellant. *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a). Even complete withholding of evidence is subject to harmless error analysis. "Where an appellant demonstrates that the Government failed to disclose discoverable evidence in response to a specific request . . . the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt." *Roberts*, 59 M.J. at 327. Here, the evidence was provided to the defense the day after the request to abate. The messages released by the military judge did not materially differ from the messages the appellant had already obtained prior to trial. The Facebook messages that the appellant used during trial had been obtained prior to the Article 32, UCMJ, 10 U.S.C. § 832, hearing, well in advance of trial. Even if the evidence of the additional messages had not been disclosed prior to opening statements, it would still have been cumulative of the other messages showing A1C EO's dissatisfaction with the Air Force and her potential motive to falsify her claim. Any error in the military judge's failure to abate the proceeding was harmless beyond a reasonable doubt.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

ACM 38516