**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Staff Sergeant TAVARSE A. GREEN**
**United States Air Force**

**ACM 38586**

**20 October 2015**

Sentence adjudged 24 November 2013 by GCM convened at Malmstrom Air Force Base, Montana. Military Judge: Todd E. McDowell.

Approved Sentence: Dishonorable discharge, confinement for 1 year, and reduction to E-1.

Appellate Counsel for the Appellant: Captain Lauren A. Shure.

Appellate Counsel for the United States: Major Mary Ellen Payne; Captain Richard J. Schrider; and Gerald R. Bruce, Esquire.

Before

TELLER, MAYBERRY, and DUBRISKE
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

TELLER, Senior Judge:

Appellant was convicted, contrary to his pleas, by a panel of officer and enlisted members of making a false official statement, simple assault, assault consummated by a battery, and assault on a child, in violation of Articles 107 and 128, UCMJ, 10 U.S.C. §§ 907, 928.[1] The court sentenced him to reduction to E-1, confinement for one year, and a dishonorable discharge. The sentence was approved, as adjudged, on 15 April 2014.

---

[1] Appellant was acquitted of several more serious offenses including rape, forcible sodomy, and aggravated assault.

Appellant argues that the evidence was legally and factually insufficient with regard to four of the specifications, the military judge erred in admitting the testimony of Appellant's neighbor, and sentence relief is warranted due to unreasonable post-trial delay. The court also specified an issue concerning whether the presence of material excluded by the military judge on the copy of Prosecution Exhibit 3 in the record of trial affected our Article 66, UCMJ, 10 U.S.C. § 866, review of the findings and sentence. We find that the evidence was legally insufficient with regard to the word "slap" in Charge I, Specification 8. Finding no other error that materially prejudices a substantial right of Appellant, we affirm the remainder of the findings and the sentence.

*Background*

When stripped of all the offenses of which Appellant was acquitted, this case paints an all too familiar picture of domestic violence involving both intimate partner abuse and child abuse. From an evidentiary standpoint, these cases often present significant challenges brought about by intense feelings of loyalty, guilt, and betrayal, as well as conflicting personal interests. When, as in this case, the allegations span recurring cycles of multiple abusive relationships, the biases of the individuals shift over time, leading to conflicting testimony not only between individuals, but often between statements provided by a single individual depending upon the circumstances. Such cases defy any attempt to draw conclusions about whether any witness is universally credible or not credible, trustworthy or not trustworthy, because most will have been honest at times and less honest at others. Appellant's assault convictions, however, relate to episodes where there is some independent evidence against which the conflicting testimony can be weighed.

Appellant was alleged to have assaulted his then-girlfriend, ADS, by strangling her. Appellant and ADS were engaged in an on-again, off-again relationship from early 2007 until February 2013 and shared custody of their two young daughters. ADS testified that in the winter of 2008–2009, after a disagreement about parenting their oldest daughter, Appellant cornered her in the kitchen of his apartment and choked her. She testified that Appellant backed her up against the kitchen sink, that she initially screamed, and that the assault ended only after Appellant's roommate, KB, came in to "[get] him away from [her]" and "make him stay back." This allegation formed the basis of Specification 2 of Charge I. One of the other victims in the case, ANS (discussed below), later testified that Appellant admitted choking ADS during this timeframe.

During cross-examination, trial defense counsel elicited testimony that substantially undermined ADS's testimony generally and about that incident in particular. ADS conceded she was engaged in a custody dispute with Appellant at the time of her testimony. She also admitted that she resented Appellant for "using her" for sex while planning to become engaged with a new girlfriend. She agreed that she did not report the assault at the time, and in fact, moved in with Appellant relatively soon after the incident.

Defense counsel questioned her ability, if she was being choked at the time, to scream loudly enough to attract the attention and action of KB.

At trial, Appellant was acquitted of aggravated assault as originally alleged by Specification 2 of Charge I, but found guilty of the lesser included offense of simple assault. As such, we need not reach findings of fact under our Article 66, UCMJ, authority with regard to ADS's testimony about any touching by Appellant.[2] However, the facts which would support the members' findings with regard to the simple assault conviction remain relevant.

KB also testified at Appellant's trial. He related that, while he was in his room playing a game and listening to "pretty loud" music, he heard ADS screaming his name. According to him, he ran out into the kitchen and living room area, where he saw ADS standing by the sink crying and saying that she wanted to leave. He testified that Appellant was standing about five or six feet away from ADS, next to but not blocking the door out of the apartment. He also testified that as soon as he asked Appellant to step aside, ADS left the apartment. KB affirmed that he and Appellant were friends and that ADS had only been to the apartment "once or twice." All of the other evidence in the case was consistent with his testimony suggesting that any bias that may have existed would have been in favor of Appellant and not ADS or any of the other victims.

After weighing the evidence and judging the credibility of the witnesses, we make the following findings of fact. In the winter of 2008–2009, Appellant and ADS had a disagreement about parenting their daughter that led to a confrontation in the kitchen of Appellant's apartment. At some point in the confrontation, Appellant's actions caused ADS to believe she would be physically harmed, so she cried out to KB for help. Her cries were loud and urgent enough to attract KB's attention over the music he was playing. When KB reached the kitchen, ADS was still visibly upset. Appellant was standing no more than six feet from ADS and in close proximity to the door. As soon as KB intervened with Appellant, ADS left the apartment.

Appellant was also alleged to have unlawfully grabbed, punched, slapped, and pushed a different victim, ANS, between 1 August 2009 and 15 March 2012. Unlike the allegation above which arose from a single incident, the Government offered evidence of multiple instances of abuse to support a consolidated specification.

ANS testified to a long history of abusive conduct by Appellant. She moved into an apartment with Appellant in August 2009, and shared several different residences with him between then and November 2011. She testified that in September 2009, Appellant

---

[2] We note that our ability to find facts regarding bodily harm would be constrained by the member's finding of not guilty to the greater offenses. *See United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003) ("A Court of Criminal Appeals cannot find as fact any allegation in a specification for which the fact-finder below has found the accused not guilty.").

struck her in the face with a closed fist. She and Appellant went to the hospital where the staff obtained an x-ray image of her jaw and stitched up a cut on her lip. She also testified to several assaults in or around November 2011. She said Appellant "punched [her] a few times in the face and in the ribs." She did not seek medical treatment because, based upon her medical training, "with broken ribs, cracked ribs, or anything all they can do is provide you medication for pain killers and give you bed rest." She stated that, on another occasion, "[she] was on his daughter's bed and he was straddled over [her] punching [her] in the face." ANS also testified about several alleged sexual assaults of which Appellant was acquitted. During the course of this testimony, she testified that she and Appellant "were arguing in the living room and he got upset with [her] and pushed [her] over the side of the couch."

During cross-examination, Appellant's trial defense counsel elicited testimony undercutting ANS's credibility and her recollection of events. She admitted telling providers at the hospital that her injuries were sustained in a fall. She also admitted that she never made any allegations of assault until after Appellant married another woman. She conceded that she was upset by Appellant "cheating on [her]" while they were living together. She also testified that she could not recall many of the circumstances surrounding the alleged assaults. Trial defense counsel also generally elicited testimony that ANS could herself be violent and confrontational at times. She also conceded that her three statements to law enforcement alleged progressively more serious misconduct, including allegations of sexual assault that were never raised at the time of the alleged assault or in either of her first two statements. Appellant also introduced testimony from an acquaintance of both ANS and Appellant that when Appellant's name first came up in conversation as a person they both knew, ANS derided Appellant and told the witness she and ADS were "going to get him in the end for what he's done." In addition, three other witnesses testified that ANS was not a truthful person.

The Government introduced independent evidence generally corroborating the allegations of assault. Appellant's roommate KB testified that he saw ANS at the hospital with Appellant when she sought treatment for an injured lip. He testified that Appellant told him that ANS started fighting him as he was trying to leave the apartment and that after she hit him several times he hit her in the mouth. KB testified that he saw no scratches or bruises on Appellant that night. The Government also introduced ANS's medical records from 9 September 2009. The records corroborate her testimony that she sustained lacerations to her lip that required sutures, that she suffered severe jaw pain, and that she told the medical providers that the injury was sustained in a fall. Finally, the Government offered testimony from a woman who lived in the apartment adjoining the apartment where Appellant and ANS lived between October 2011 and February 2012. During this period of time, she saw a woman at Appellant's apartment with an old bruise around her eye, and she often heard loud angry yelling from Appellant's apartment, including one exchange where she heard a woman say "stop hitting me" and a man respond "you don't tell me what to f'in -- [expletive] do." She testified that on one

occasion she heard a banging noise, "like something was slammed -- someone was slammed against our bedroom wall."

After weighing the evidence and judging the credibility of the witnesses, we make the following findings of fact. On or about 9 September 2009, Appellant struck ADS in the mouth with a closed fist. In the fall of 2009, after an argument in their apartment, Appellant pushed ADS over the side of a couch. In or around November 2011, Appellant, while on top of ADS who was lying on their bed, punched ADS in the face and ribs.

Appellant was also alleged to have assaulted his wife, BG, on or about 10 March 2013. Specifically, the Government alleged that Appellant unlawfully pulled her hair, threw her into a counter and a refrigerator, and pushed her onto the ground. Appellant and BG were married on 14 February 2013. On the day of the alleged assault, BG was at home with her younger sister MB, Appellant, and Appellant's brother. The evidence is clear BG sought treatment at the emergency room that evening for rib pain and trouble breathing. The testimony concerning what led up to that treatment, however, differs substantially.

BG testified during the findings phase of the trial. She testified that she and Appellant first got into an argument upstairs about Appellant going through her phone. She went downstairs, but Appellant came down as well and resumed the argument in the living room where her sister MB, and Appellant's brother JS, were sitting. The argument then moved to the kitchen, where it escalated from bickering into "screaming and cussing." When asked if the argument resulted in either her or Appellant touching each other, she testified:

> [BG]: When he first got into the kitchen, he touched my shoulder, I mean not forcefully or anything. He just touched my shoulder to get my attention. And, you know, my hair was behind my back so I felt his hand on my shoulder. And as far as touching goes, that's the only touching that happened.
>
> [Defense Counsel]: When you felt his hand on your hair, did you say anything?
>
> [BG]: Yeah. I freaked out and I automatically assumed that he was trying to do something to my hair, my back, or whatever. So, I said, "Oh, you're just going to pull my hair." And I was screaming that.

[Defense Counsel]: Now, when you're saying, when you're talking about pulling your hair, is this something that you're yelling?

[BG]: Yes, I'm yelling.

The internal inconsistency—that they were engaged in a heated argument, yet Appellant needed to touch her shoulder to get her attention—was never clarified. We note, however, that this implausible version of events matches the version of events Appellant gave to investigators soon after the incident. BG's testimony also never clarified why Appellant's touch on her shoulder would have caused her to automatically assume he was trying to pull her hair. BG went on to specifically deny that Appellant ever flung her around by her hair, or that he slammed her into the stove, refrigerator, or counter. She also testified that although JS came into the kitchen during the argument, MB did not.

BG also testified about the events leading up to her hospital visit. She said that after the argument, but before leaving to take MB home, she began to have breathing trouble: "[W]hen I was about to take [MB] home, I was, like you know, I have asthma and I was freaking out." But a short time later she testified:

[BG]: Well, like I said, when I [returned from taking MB home] and I didn't see that he was home, I immediately freaked out. I, like you said, started hyperventilating. I was really upset. I sat on the stairs for a little bit and, then, as I am having a hard time breathing, my side started hurting too, and --

[Defense Counsel]: Now, you said your side started hurting. Was it typical for your side to be hurting, or why was your side hurting?

[BG]: I wasn't -- in the moment of me being upset, I was, like, why is my side starting to hurt? I had to think about it for a minute while I am having a hard time breathing, trying to figure out why my side was hurting that much.

[Defense Counsel]: And did you figure out why your side was --

[BG]: Yeah. Once I -- like, after I had called my sister and I started to, like, be able to take deep breaths again, I started thinking about it and I realized what it was from or [. . .]

[Defense Counsel]: And what --

6                                                                                    ACM 38586

[BG]: . . . what I believe it was from.

[Defense Counsel]: What do you believe the side pain was from?

[BG]: Earlier in the day, Tavarse and I had sex. We were up in the room and he, like, pushed me up against the dresser and all of the drawers were hanging out of the dresser, and I felt it at the time. Like, I felt like a little pain in my side, but I didn't think anything of it at the time. It wasn't, like -- You know, it hurt at the moment when it happened, like oww, like you hit something, but I didn't think anything of it. Afterwards, it didn't start coming back to be extremely painful until I was having a hard time breathing.

During Appellant's interview with law enforcement, he stated that BG told him that she was "running around outside where she hit a pole." The investigator skeptically asked if she said she "hit a pole," to which Appellant responded "[h]er exact words."

Appellant's brother, JS, also testified about the events in the kitchen.

[Defense Counsel]: Okay. During that argument were you in the living room the whole time?

[JS]: Towards -- until the end of the argument, yes.

[Defense Counsel]: And was [MB] there with you?

[JS]: Yes.

[Defense Counsel]: Now, you said until towards -- until the end of the argument?

[JS]: Um-hm.

[Defense Counsel]: Where did you go towards the end of the argument?

[JS]: I went into the kitchen where Tavarse and [BG] were.

[Defense Counsel]: So, at some point Sergeant Green and [BG] had moved from upstairs to down in the kitchen?

[JS]: Yes, Sir.

[Defense Counsel]: And what caused you—why did you go into the kitchen?

[JS]: Because they was [sic] yelling and arguing, and I just feel it was inappropriate to yell when you are in front of company.

[Defense Counsel]: Could you tell was their arguing affecting [MB]?

[JS]: At the time, no. She was just standing there.

[Defense Counsel]: And when you went to the kitchen, what did you see?

[JS]: I went to the kitchen and Tavarse and [BG] were separated. Tavarse by the sink and [BG] was over by the counter.

[Defense Counsel]: And were you [the] first one to go into the kitchen?

[JS]: Yes, Sir.

[Defense Counsel]: At any time that evening did you see any physical altercation?

[JS]: No, sir. It was all verbal.

[Defense Counsel]: And when you went to the kitchen, where was [MB]?

[JS]: She was still on the couch.

[Defense Counsel]: Did she ever follow you?

[JS]: No.

Neither counsel clarified the inconsistency between JS's testimony that MB remained seated on the couch, suggesting she could not see what happened in the kitchen, and his answer that during this timeframe MB "was just standing there," suggesting that she might have seen.

MB testified during the Government's case, and her testimony directly contradicted both BG and JS. She testified that she went into the kitchen when she heard her sister yell, "Don't touch me." Then as she got to the kitchen doorway, "[she] saw

him grab her by her hair and he swung her across the kitchen and then after she hit the fridge she dropped to the ground . . . ."

BG's other sister, HB, testified about taking BG to the hospital. According to her, during the ride BG explained what had happened:

> And she was like, "And then he grabbed me by the hair and swung me around," and she's like, I don't know. I was like, "[BG] tell me." She kept crying and she's like, "Well, I think I hit—I hit the counter and I think I hit the fridge and I was just on the floor," and I was like, "What?" and I was like, "Are you okay?" And she's like, "I think my ribs are broken . . . ."

The hospital records show that BG told the staff that the source of her injuries was being punched in the ribs. They also note that her "left lower lateral and anterior ribs" were tender.

In order to address Appellant's assignments of error, we must resolve this conflicting testimony. We are cognizant that BG, the alleged victim, was in the best position to know what transpired that night. However, in establishing whether she truthfully recounted the events, we must also weigh her bias towards her husband, any inconsistencies between her testimony and prior statements, and the degree to which her description of events aligns with the medical records. The testimony of BG and JS had inherent inconsistencies suggesting that they had interwoven exculpatory explanations for the injuries with their true recollection of events, or that they were offering implausible explanations to account for potentially incriminating evidence from other sources. The evidence includes four different explanations for the injuries from BG. In contrast, MB's version of events and HB's account of BG's explanation shortly after the event are both consistent with each other and consistent with the medical records.

After weighing the evidence and judging the credibility of the witnesses, we find that on or about 10 March 2013, while in the kitchen of their home, Appellant grabbed BG by the hair, swung her into the counter and refrigerator, and pushed her onto the floor.

*Legal and Factual Sufficiency*

Appellant argues that the evidence was factually and legally insufficient to support four specifications: Specifications 2, 5, and 8 of Charge I, as well as Specification 2 of Charge II. We review issues of factual and legal sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

"The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *Turner*, 25 M.J. at 324, *quoted in United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

*Charge I, Specification 2*

Under Specification 2 of Charge I, the members found Appellant guilty of the lesser included offense of simple assault by offer. Appellant claims that the evidence was legally and factually insufficient "because there is no credible evidence that Appellant even touched Ms. ADS." However, as the military judge properly instructed the panel, "this lesser offense of simple assault requires only the offer to do bodily harm." Appellant need only have placed her in reasonable apprehension of harm.

The panel returned a general verdict of guilt as to the simple assault, which creates some ambiguity as to the precise conduct of Appellant which the members found created a reasonable apprehension of harm.[3]

---

[3] The military judge, while instructing on this lesser included offense, told the members that:

> In order to find the accused guilty of this lesser offense with regard to Specification 2 of Charge I, you must be convinced by legal and competent evidence beyond reasonable doubt: (1) That, at or near Great Falls, Montana, between on or about 1 November 2008 and on 22 or about 1 April 2009, the accused offered to do bodily harm to [ADS]; (2) That, the accused did so by strangling her on the neck; and, (3) That, the offer was done with unlawful force or violence. For Specification 2 of Charge I, this lesser included offense differs from the lesser included offense of battery, which I discussed previously, in that

In returning such a general verdict, a court-martial panel resolves the issue presented to it: did the accused commit the offense charged, or a valid lesser included offense, beyond a reasonable doubt? A factfinder may enter a general verdict of guilt even when the charge could have been committed by two or more means, as long as the evidence supports at least one of the means beyond a reasonable doubt.

*United States v. Brown*, 65 M.J. 356, 359 (C.A.A.F. 2007). Accordingly, if we find the evidence legally and factually sufficient to conclude beyond a reasonable doubt that any of Appellant's conduct during the incident in the kitchen constituted an offer to do bodily harm, and that such offer was made with unlawful force or violence, then the panel's general verdict of guilt to the lesser included offense of simple assault may be upheld.

Having resolved the conflicting testimony as described above, we find that Appellant's conduct caused ADS to reasonably apprehend bodily harm. ADS testified that Appellant "cornered" her in the kitchen. Although the panel apparently did not believe her further description of Appellant choking her until KB physically pulled him away was proved beyond a reasonable doubt, actual touching is not required to sustain the conviction. Merely cornering her, in the context of a heated disagreement, could have been enough to cause her to reasonably apprehend bodily harm. KB's testimony that ADS cried out loud enough to be heard over the music, that her cries sounded sufficiently urgent to cause him to investigate, and that by the time he got to the kitchen ADS was still crying constitute strong circumstantial evidence that Appellant's conduct did indeed cause ADS to fear he was about to harm her. We reach that conclusion ourselves beyond a reasonable doubt, and find that a reasonable factfinder could also have done so.

*Charge I, Specification 5*

Under Specification 5 of Charge I, the members found Appellant guilty of unlawfully pulling BG's hair, throwing her into a counter and refrigerator, and pushing her to the ground. Appellant argues that three out of four individuals present denied that any physical altercation took place and those who testified otherwise were not credible. We disagree. We find the quality of the testimony concerning this allegation more persuasive than the quantity. Although Appellant denied committing any assault, and his

---

the previous lesser included offense requires as an essential element that you be convinced beyond a reasonable doubt that the accused did bodily harm to [ADS]; whereas, this lesser offense of simple assault requires only the offer to do bodily harm.

This instruction was plain error, in that the lesser included offense of simple assault does not require proof that Appellant actually strangled ADS on the neck. However, we find that this instruction did not prejudice Appellant because the erroneous instruction only served to heighten the Government's burden of proof, not lower it. The instruction as a whole adequately differentiated between the greater and lesser offenses.

wife and brother testified substantially in accordance with his denial, all of those parties have an obvious bias. We find the account given by BG at trial unpersuasive and inconsistent with both the injuries described in the medical records and the mechanism of injury she reported to the medical staff that night. MB's account of events matches up convincingly with HB's account of BG's statements that night. In accordance with our findings of fact above, we conclude beyond a reasonable doubt that Appellant unlawfully pulled BG's hair, threw her into a counter and refrigerator, and pushed her to the ground. We similarly decide that a reasonable factfinder could reach that conclusion as well.

*Charge I, Specification 8*

Under Specification 8 of Charge I, the members convicted Appellant of unlawfully grabbing, punching, slapping, and pushing ANS. As discussed above, after resolving the conflicting testimony, we find that Appellant punched and pushed ANS. Although there was no direct testimony asserting that Appellant "grabbed" ANS, there was substantial circumstantial evidence to that effect. ANS described one assault where Appellant got on top of her while she was in her daughter's bed and punched her in the face and ribs. Drawing every reasonable inference in favor of the prosecution, a reasonable factfinder could conclude that such an assault would necessitate grabbing at some point. While it is theoretically possible for such an assault to take place without grabbing the victim, the evidence need not disprove every possible or fanciful doubt. It need only establish beyond a reasonable doubt that the appellant is guilty of the acts alleged. We ourselves, having made allowances for not personally observing the witnesses, are convinced beyond a reasonable doubt that Appellant also grabbed ANS.

The specific allegation that Appellant slapped ANS is a different matter. There was no direct evidence that Appellant slapped ANS. Appellant's neighbor testified that she heard fighting, heard a woman say "stop hitting me," and saw a woman at Appellant's apartment with an old bruise around her eye. Even drawing every reasonable inference in favor of the prosecution, we find no evidentiary link between that testimony and slapping, as opposed to other means of striking ANS. We ourselves are not convinced beyond a reasonable doubt that Appellant specifically slapped ANS. Accordingly, we find that portion of the specification legally and factually insufficient, and modify the findings as described in our decretal paragraph below.

*Charge II, Specification 2*

Specification 2 of Charge II alleges Appellant made a false official statement to an investigator, in that he stated, "I never touched [BG] except to put my hand on her shoulder." Appellant argues that since the evidence supporting the allegation of assaulting BG was factually and legally insufficient, then the evidence supporting the allegation he made a false denial of that offense is legally and factually insufficient as well. As discussed above, we find the evidence supporting the allegation of assault

legally and factually sufficient. However, we still review de novo the factual and legal sufficiency of the allegation that he also falsely denied any assault. We find that, after drawing all reasonable inferences in favor of the prosecution, a reasonable factfinder could have found all of the elements of the offense beyond a reasonable doubt. After weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this Court is also convinced of the appellant's guilt beyond a reasonable doubt.

*Admission of Neighbor's Testimony*

Appellant further argues that the military judge erred in admitting the testimony of EC, who was for a period of time Appellant's neighbor. We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id*. (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)). When a military judge lays out a Mil. R. Evid. 403 analysis on the record, we will overturn the ruling only if there is a clear abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

In this case, the military judge's decision to admit EC's testimony under Mil. R. Evid. 401 and 403 was clearly within his reasonable discretion. Appellant's trial defense counsel raised timely objections on the basis of relevance and argued that even if relevant, the probative weight of the evidence was substantially outweighed by unfair prejudice to Appellant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. ANS testified that Appellant was physically abusive towards her in Appellant's apartment while Appellant lived next door to EC. EC testified that she heard sounds consistent with such behavior coming from Appellant's apartment, and saw a woman with a bruise around her eye in Appellant's apartment during that period of time. While EC's testimony is not direct evidence of any charged offense, it is circumstantial evidence corroborating ANS's version of events. As such, it tends to make the existence of the facts underlying her allegation somewhat more probable, and was legally relevant under Mil. R. Evid. 401.

Even though relevant, evidence may be excluded under Mil. R. Evid. 403 if its probative value is substantially outweighed by unfair prejudice. Since the military judge in this case conducted his balancing on the record, our analysis does not focus on whether we would find the probative value substantially outweighed, but whether the military judge's ruling was a clear abuse of discretion. We find that it was not. The value of the circumstantial evidence was not insubstantial, especially in light of Appellant's attacks on ANS's credibility. The military judge applied the correct law and his findings of fact were not clearly erroneous.

Appellant also raises the argument, for the first time on appeal, that EC's testimony was improper character evidence under Mil. R. Evid. 404. Appellant did not raise this objection at trial.

> Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error. A timely and specific objection is required so that the court is notified of a possible error, and so has an opportunity to correct the error and obviate the need for appeal.

*United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (internal quotation marks and citations omitted). Under plain error review, the appellant has the burden of showing there was error, that the error was plain or obvious, and that the error materially prejudiced a substantial right of the appellant. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011). Appellant has failed to demonstrate error in this case. As noted above, EC's testimony was circumstantial evidence corroborating ANS's testimony. As such, it had a valid non-propensity purpose, and the military judge did not err by declining to, on his own initiative, exclude EC's testimony under Mil. R. Evid. 404.

*Post-trial Delay*

Finally, Appellant asserts that this Court should grant him meaningful relief in light of the 142 days that elapsed between completion of trial and the convening authority's action. Under *United States v. Moreno*, courts apply a presumption of unreasonable delay "where the action of the convening authority is not taken within 120 days of the completion of trial." *United States v. Moreno*, 63 M.J. 129, 142 (2006). Appellant does not assert any prejudice, but argues that the court should nonetheless grant relief under *United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002).

This court set out a non-exhaustive list of factors we consider when evaluating the appropriateness of *Tardif* relief in *United States v. Bischoff*, 74 M.J. 664 (A.F. Ct. Crim. App. 2015). *See also United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015) (articulating factors specifically tailored to answer the question of whether *Tardiff* relief is appropriate). The factors include the length and reasons for the delay, the length and complexity of the record, the offenses involved, and the evidence of bad faith or gross negligence in the post-trial process. Appellant has not asserted any additional factors that merit consideration in this case. The length of the delay only exceeded the standard by 22 days. The Government obtained a declaration establishing that, while the case was not languishing due to inattention, the reasons for the delay were fairly routine matters of ensuring an accurate and complete record of trial. The record itself was substantial, comprised of a 1,105 page transcript and spanning 9 volumes. While Appellant was

acquitted of the most serious charges in this case, he stands convicted of assaults on three separate intimate partners and false statements to investigators related to those assaults. Finally, there was no evidence of bad faith or gross negligence. On the whole, we find the delay, although presumptively unreasonable, to be reasonable in this case and conclude no *Tardif* relief is warranted.

*Excluded Material in Appellate Record*

In the course of conducting our review under Article 66, UCMJ, the court discovered that the optical disk included in the record as Prosecution Exhibit 3 contained portions of the recorded interview between Appellant and law enforcement agents that had been excluded by the military judge. We specified for briefing by the parties the question of how the presence of the disk affects our review. In response, the Government solicited information from the members as to whether they recalled seeing any of the excluded video during their review. All but one of the members did not recall whether they saw any of the excluded video. One member specifically recalled that he did not view any video depicting more than what was played in open court, and that he did not view Appellant's request for an attorney.

The requirement for a complete, verbatim record in a general court-martial resulting in a punitive discharge is established in Article 54(c)(1)(A), UCMJ, 10 U.S.C. § 854(c)(1)(A). "The requirement that a record of trial be complete and substantially verbatim in order to uphold the validity of a verbatim record sentence is one of jurisdictional proportion that cannot be waived." *United States v. Davenport*, 73 M.J. 373, 376 (quoting *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000)). Our superior court has held that the record need not be literally verbatim, that is a word-for-word account of the proceedings, but rather just substantially verbatim. *Id.* at 377. Generally speaking, in assessing whether a record is verbatim, the threshold question is "whether the omitted material was 'substantial,' either qualitatively or quantitatively." *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982). In this case, the question is not whether the record omitted material, but rather whether the record accurately reflects the proceedings in the first place. Accordingly, the first step in our analysis is to determine what constituted Prosecution Exhibit 3 in the proceedings below.

Based upon our review of the record, we find as fact that Prosecution Exhibit 3, as admitted by the military judge, played in open court, and provided to the members during deliberations, consisted of an optical disk containing only two video files depicting the portion of Appellant's interview up to but not including his request for an attorney. A Court of Criminal Appeals may use its Article 66, UCMJ, authority to decide factual questions concerning how a case procedurally unfolded below. *See United States v. Stoffer*, 53 M.J. 26, 27 (C.A.A.F. 2000). In this case, the record is in conflict as to whether Prosecution Exhibit 3 consisted of the redacted video, as indicated by the transcript, or the unredacted video, as indicated by the disk in the appellate record.

Appellant appears to take the position that the disk in the record is presumptively the exhibit that went to the members. Absent any other indication in the record, that argument would be persuasive. However, the transcript of proceedings clearly suggests the opposite. Only two video files were played for the members. The transcript indicates that the video played in open court ended before Appellant asked for an attorney. The assistant trial counsel indicated verbally on the record that the last video file played to completion. The assistant trial counsel then provided the disk itself to the court reporter. The exhibits provided to the members were retrieved directly from the court reporter. We accord more weight to the transcript than the disk contained in the record because the transcript provides direct evidence of the content of the exhibit, whereas the contents of the disk could only be ascertained indirectly.

Our factual finding with regard to the content of Prosecution Exhibit 3 at trial does not terminate our inquiry. We must still determine whether, due to the inclusion of the extraneous matter, the record can still be considered complete and substantially verbatim. We note at the outset that Appellant does not assert, even as an alternative argument, that the state of the record precludes our review under Article 66, UCMJ. That position is consistent with what little case law we could find on the matter. In *United States v. Kulathungam*,[4] our superior court held that "it is inappropriate for a trial counsel to add to the record of trial things that were not said or done at the court-martial. However, such misconduct does not require reversal when there is no impact on the pleas or the sentence." *United States v. Kulathungam*, 54 M.J. 386, 387–88 (C.A.A.F. 2001). In this case, it appears that the inclusion of material excluded by the military judge in the appellate record was negligent, not intentional. We find no evidence that such matters were ever provided to the members, and accordingly we find that they did not affect the findings or the sentence. We also note that, although the opinion did not address the issue directly, the *Kulathungam* court did not find that the willful alterations to the transcript precluded appellate review. Accordingly, we find that the inclusion of the unredacted video in the record of trial was error, but that such error did not materially prejudice a substantial right of Appellant and therefore does not warrant reversal. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

*Sentence Reassessment*

Having found the evidence factually and legally insufficient as to the allegation in Specification 8 of Charge I that Appellant slapped ANS, we must determine whether we can reassess the sentence. This court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the

---

[4] In *Kulathungam*, the trial counsel, in an effort to cure the military judge's failure to announce the findings in a guilty plea trial, deliberately included language purporting to announce findings in the transcript knowing that such additions did not reflect the actual proceedings at trial. *United States v. Kulathungam*, 54 M.J. 386, 387 (C.A.A.F. 2001).

sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). This analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16.

Here, there is no change in the penalty landscape from our action excepting slapping from Specification 8 of Charge I. The maximum punishment would remain the same. Appellant remains convicted of several different mechanisms of assault against ANS, capturing the gravamen of the misconduct and retaining the admissibility and relevance of the surrounding circumstances. We also find that the remaining offenses are of the type with which we have experience and familiarity as appellate judges to determine the sentence that would have been imposed. We have considered the totality of the circumstances and reassess the sentence to the same sentence approved by the convening authority.

*Conclusion*

We affirm Specification 8 of Charge I, excepting the language "slap." We affirm the remainder of the findings. The findings, as modified, and the sentence as reassessed, are correct in law and fact, and no remaining error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ. Accordingly, the findings, as modified, and the sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court