# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

### Senior Airman CORY D. PHILLIPS
### United States Air Force

### ACM 38771

### 7 September 2016

Sentence adjudged 6 November 2014 by GCM convened at Peterson Air Force Base, Colorado. Military Judge: Shelly W. Schools (sitting alone).

Approved Sentence: Bad-conduct discharge, confinement for 1 year, and reduction to E-1.

Appellate Counsel for Appellant: Captain Annie W. Morgan.

Appellate Counsel for the United States: Lieutenant Colonel Roberto Ramirez; Major Mary Ellen Payne; Major Jeremy D. Gehman; Major J. Ronald Steelman; Captain Sean J. Sullivan; and Gerald R. Bruce, Esquire.

Before

MAYBERRY, DUBRISKE, and J. BROWN
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

DUBRISKE, Senior Judge:

Contrary to his pleas, Appellant was convicted by a military judge sitting alone of aggravated sexual assault against one victim and abusive sexual contact against another victim, in violation of Article 120, UCMJ, 10 U.S.C. § 920. The aggravated sexual assault conviction was based on the 2007 *Manual for Courts-Martial (MCM)* version of Article 120, UCMJ. Appellant was acquitted of an additional specification of abusive sexual contact involving the same victim of the aggravated sexual assault offense.

Appellant was sentenced to a bad-conduct discharge, one year of confinement, and reduction to E-1. The convening authority approved the sentence as adjudged.

Appellant initially raised two assignments of error alleging the specifications supporting his convictions were legally and factually insufficient. Appellant filed a supplemental assignment of error, which this court granted on 11 July 2016, arguing the military judge erred when she considered charged offenses as propensity evidence. Appellant raised the supplemental assignment of error based on our superior court's recent decision in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016).

Although we find error based on the military judge's use of charged offenses as propensity evidence, we have determined the error was harmless beyond a reasonable doubt and, therefore, affirm the findings and sentence in this case.

*Background*

The sexual assault offenses charged in this case surrounded Appellant's relationship with two different Airmen at Peterson Air Force Base, Colorado. The charged incidents were the result of sexual activity that took place after these Airmen had consumed alcohol and fallen asleep in Appellant's presence.

Appellant was assigned to the same squadron as these Airmen and, as such, had regular on-duty contact with both of them. With regard to one of the Airmen, Appellant had a short romantic relationship in which all consensual sexual activity ended approximately a week prior to the charged offense. Appellant continued to have recurring off-duty contact with this particular Airman until the beginning of the criminal investigation against him.

Additional facts necessary to resolve the assignments of error are provided below.

*Sufficiency of the Evidence—Aggravated Sexual Assault*

In his first assignment of error, Appellant argues the evidence produced at trial was factually and legally insufficient to support his conviction for aggravated sexual assault of Senior Airman (SrA) LS. Appellant specifically focuses on the prosecution's failure to prove beyond a reasonable doubt that Appellant engaged in sexual intercourse with SrA LS as alleged. In so arguing, Appellant points to SrA LS's inability to recall any factors leading her to believe Appellant engaged in sexual intercourse with her on that evening.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324; *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

To sustain a conviction for aggravated sexual assault, the prosecution was required to prove: (1) That Appellant engaged in a sexual act with SrA LS by penetrating her vulva with his penis; and (2) that he did so when SrA LS was substantially incapable of communicating her unwillingness to engage in the sexual act. *MCM, United States*, app. 28, at A28-6, ¶ 45.b.(3)(c)(2) (2012 ed.).

The evidence supporting the charged offense came from the testimony of SrA LS, the in-court testimony of Appellant, and his various pretrial statements regarding the incident. Appellant and SrA LS had previously been involved in a romantic relationship, but SrA LS decided about a week before the charged incident that they should forgo the romantic aspects of their relationship and just remain friends.

SrA LS testified that in June 2012 she had been out drinking with some friends and, although intoxicated, was in possession of her mental faculties when she returned to a friend's on-base house where Appellant had been socializing. After continuing to drink at this friend's house, SrA LS and Appellant returned to her dormitory room. SrA LS remembered eating some food before laying down on her bed to go to sleep. Appellant was sitting in a chair at this time.

SrA LS awoke to find Appellant trying to put back on her underwear. Appellant was so far unsuccessful as he had attempted to guide both of SrA LS's legs through one hole of the underwear. SrA LS pushed Appellant off of her, which resulted in his immediate departure from her room. SrA LS got out of bed to make sure her door was shut behind Appellant and then fell back asleep.

The next day, SrA LS asked Appellant to come back to her dormitory room so they could discuss what had happened the previous evening. SrA LS had no memory of engaging in any sexual activity with Appellant, but still felt she had somehow been sexually violated by him. SrA LS also had no physical symptoms such as vaginal discomfort or discharge to confirm her suspicions that Appellant had engaged in sexual activity with her. Although Appellant did not admit to engaging in any sexual activity during this meeting, he became very emotional and provided a general apology for his conduct.

Approximately six months later, after a mutual friend had reported the incident involving Appellant and SrA LS to the Air Force Office of Special Investigations (AFOSI), SrA LS agreed to have a conversation with Appellant while wearing a recording device. Appellant initially informed SrA LS that he was unsure whether they had sexual intercourse. Later, in response to SrA LS's direct question of whether they in fact had sex, Appellant responded with "I think so. Yeah." Appellant also stated that they "started to hook up" and, at some point during their physical interaction, he noticed that SrA LS was unresponsive or asleep. Appellant then attempted to put SrA LS's clothes back on her and immediately left the room. Appellant also informed SrA LS that he would not have stripped her naked and had sexual intercourse with her had she not been responsive initially.

At trial, Appellant took the stand in his defense and provided a somewhat different, and more detailed, version of the events with SrA LS that evening. Appellant testified that after returning to SrA LS's dorm room, they eventually climbed into her bed and started kissing and touching each other. At some point, SrA LS's underwear was removed. Appellant then left the room to retrieve a condom from his room on the same dormitory floor. When he returned, however, Appellant found SrA LS asleep. As he felt it was not appropriate to leave SrA LS with no underwear on, Appellant attempted to put them back on her. Afterwards, Appellant left the room and went to sleep. On cross-examination, Appellant acknowledged his understanding of the word "sex" as was used in the recorded conversation to mean sexual intercourse.

Appellant's denial at trial of engaging in sexual intercourse with SrA LS was far less credible when compared to his admissions during the recorded conversation. Appellant, as he was facing trial by courts-martial, now possessed the obvious motivation to avoid a criminal conviction and the corresponding punishment. As such, his now crystal clear memory of his actions on the evening were suspect. Appellant also had trouble during cross-examination explaining why he lied to SrA LS about engaging in sexual intercourse when the truth as he relayed at trial would have quite possibly put his confused friend's mind at ease by letting her know she was not sexually violated on that evening.

Appellant's testimony was also rebutted by other evidence admitted at trial. For example, Appellant suggested at trial that SrA LS never awoke while he was trying to put her underwear back on her. This position, however, was rebutted by not only SrA LS's

testimony, but also by a pretrial statement Appellant made to the same friend who reported the incident to AFOSI. Appellant informed this friend, consistent with SrA LS's testimony, that SrA LS had initially passed out, but then awoke when he was trying to put her clothes back on her. Appellant's trial testimony also became suspect once he was unable to explain during cross-examination how he was able to put SrA LS's underwear back on her person given her unresponsive state and prone position in her bed.

Based on Appellant's more credible admissions during the recorded conversation with SrA LS, there was sufficient evidence when viewed in the light most favorable to the prosecution for the military judge to find Appellant penetrated SrA LS's vulva with his penis, and that he did so when SrA LS was substantially incapable of communicating her unwillingness to engage in the sexual act. Furthermore, after making allowances for not personally observing the witnesses, we conclude beyond a reasonable doubt, based upon our independent review of the record, that Appellant is guilty of the charged offense.

*Sufficiency of the Evidence—Abusive Sexual Contact*

Appellant next attacks the legal and factual sufficiency of his conviction for abusive sexual contact of another Airman, A1C KW. Appellant primarily argues the evidence produced at trial fails to establish A1C KW was incapable of consenting to Appellant's actions because of her impairment from consuming alcohol that evening. In support of this argument, Appellant points to the testimony of A1C KW that she believed she was not sufficiently impaired from alcohol when she awoke to Appellant touching her chest and vaginal area.

In November 2013, A1C KW was invited to have drinks with some friends from work. Appellant was also invited by the same group of friends and arrived at the off-base bar shortly after A1C KW. Although Appellant and A1C KW worked together, they had only seen each other socially one other time when they both attended a movie with a group of mutual friends from their squadron. At some point after arriving at the bar, Appellant informed a co-worker he wanted to get to know A1C KW better.

After consuming three drinks at the first bar, A1C KW and her group of friends went to two other bars where they drank and danced. A1C KW became progressively more intoxicated as the evening continued, eventually requiring assistance to maintain her balance. A1C KW was also unable to keep her eyes open and had impaired speech. At some point during the evening, Appellant had to hold A1C KW to keep her from falling down due to her level of intoxication.

As Appellant had moved from the dormitories to an off-base apartment, it was decided prior to the bar closing that A1C KW and another co-worker, SrA JY, would sleep at Appellant's apartment instead of trying to get back to their dormitory room on base. SrA JY wanted to get something to eat, so they went to a fast-food restaurant. A1C KW was

described by SrA JY as "very drunk" at this time and required physical assistance from both Appellant and SrA JY as they walked to the restaurant. A1C KW did not eat anything, but did consume some water at the restaurant.

Appellant, A1C KW, and SrA JY then took a taxi cab to Appellant's apartment, arriving around 0230 hours. A1C KW did not remember the walk from the cab to Appellant's third floor apartment. SrA JY reported A1C KW was non-responsive shortly after arriving at Appellant's apartment. He defined the term non-responsive as meaning A1C KW was "blacked out" or "unconscious." Appellant and SrA JY carried A1C KW to Appellant's bedroom and placed her in his bed. Appellant and SrA JY planned to sleep in Appellant's living room. During the course of the evening, however, Appellant at least twice entered his bedroom to "check on" A1C KW.

Approximately 90 minutes after arriving at the apartment, A1C KW woke up to Appellant touching her breast and vaginal area over her clothes, as well as directly touching her breast with his hand. Appellant eventually rolled A1C KW on top of him. A1C KW then kissed Appellant thinking he was her fiancé. Once she realized it was Appellant who was in bed with her, A1C KW rolled away from Appellant. Appellant continued to try to get A1C KW to acknowledge him, but eventually left the room after she ignored him for a period of time.

To convict Appellant of this specific offense, the prosecution had to prove: (1) That Appellant committed sexual contact upon A1C KW; and (2) that he did so when A1C KW was incapable of consenting to the sexual contact due to impairment by alcohol, and that condition was known or reasonably should have been known by him. *MCM, United States*, ¶ 45.a.(d) (2012 ed.); *see also* Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 3-45-16c. (10 September 2014).

With regard to the first element, we find the evidence sufficient to prove Appellant committed acts of sexual contact. A1C KW's testimony alone was more than enough to support this element. In this case, however, her testimony was corroborated by Appellant during a pretext conversation in which he admitted that while he never "went under [A1C KW's] pants," he may have touched her bra that same evening. Appellant also admitted to a co-worker that he kissed A1C KW and touched her breast.

Furthermore, contrary to Appellant's claims, the evidence produced at trial is sufficient to establish A1C KW did not have the mental capacity to consent to sexual activity due to her impairment by alcohol. *See generally United States v. Pease*, 75 M.J. 180, 184–85 (C.A.A.F. 2016) (discussing our sister service court's definition of the term incapable of consenting). Multiple witnesses testified A1C KW became significantly intoxicated as the evening progressed. In fact, approximately 90 minutes before the incident, A1C KW was noted to be completely non-responsive, requiring Appellant and SrA JY to carry her to Appellant's bed.

While Appellant's brief to this court focuses on A1C KW's personal assessment of the impact of alcohol on her mental capacity, he ignores her testimony that she was confused after arriving at Appellant's apartment and was clearly not aware of Appellant's presence in bed until he began touching her. Appellant's argument also fails to consider SrA JY's testimony that he awoke prior to the assault to check on A1C KW and found her sitting up in bed in a "dazed" and "disoriented" state, unable to initially answer questions posed by him. While A1C KW could not link her disorientation to her consumption of alcohol, it was entirely reasonable for the factfinder to draw this conclusion given her appearance and conduct within 90 minutes of Appellant's assault.

Taking the stand during his trial, Appellant denied initiating any physical contact with A1C KW. He advised A1C KW initiated the entire encounter by climbing on top of him and kissing him. Moreover, because A1C KW "grossed him out," Appellant testified he left the room to get away from her advances. Appellant also informed the finder of fact that he did not believe A1C KW was drunk at any point during the evening as she was able to walk and stand on her own.

Appellant's testimony is far from credible when compared against the entirety of the evidence admitted at trial. His self-serving statements about A1C KW's aggression towards him did not match his physical contact with her as documented in the pretext conversation. Likewise, his testimony that he had no interest in A1C KW's sexual advances stood in stark conflict with his statement earlier in the evening that he wanted to get to know A1C KW better.

Additionally, Appellant's hedged statement about A1C KW's level of intoxication was directly rebutted by three witnesses—all friends of Appellant—who noted A1C KW became very intoxicated as the evening progressed. More damaging, however, was Appellant's admission during the pretext conversation that the group eventually stopped A1C KW from drinking as she had clearly had enough alcohol for the evening. Considering all of these conflicting factors, it would not be surprising for the finder of fact to determine Appellant's self-serving testimony in his defense was not credible.

Based on A1C KW's testimony, the strong evidence regarding her level of intoxication, and the various admissions from Appellant, we find the evidence was sufficient, when viewed in the light most favorable to the prosecution, for a reasonable finder of fact to conclude that Appellant engaged in sexual contact with A1C KW when she was incapable of consenting to the sexual acts due to her alcohol impairment, and that condition was known or reasonably should have been known by Appellant. Moreover, making allowances for not personally observing the witnesses, we also conclude beyond a reasonable doubt, based upon our independent review of the record, that Appellant is guilty of the charged offense of abusive sexual contact.

Immediately prior to findings argument, the military judge summarized on the record a Rule for Courts-Martial (R.C.M.) 802 session where she discussed with counsel the findings instructions she would consider during her deliberations. She noted she would specifically consider propensity evidence under Mil. R. Evid. 413 based on a request by trial counsel. The military judge performed no analysis on the admissibility of the propensity evidence on the record. Moreover, given the discussion of instructions took place off the record, it is unclear if trial defense counsel initially objected to the military judge's consideration of propensity evidence in this case.

Although not the primary focus of his findings argument, trial counsel highlighted Appellant's propensity to commit sexual misconduct:

> Now, Your Honor, is familiar with how to apply that evidence under [Mil. R. Evid.] 413. I'm not going to stand here and argue the law. I just ask you to consider it, and when you do consider it, it's pretty compelling, Your Honor, because if you look at the circumstances they are all pretty similar. We can see throughout this process how does [Appellant] like his women? Out . . . asleep . . . passed out on the bed. That's what this shows us.

Trial counsel briefly revisited the propensity theme during his rebuttal argument.

Pursuant to a supplemental assignment of error, Appellant raises for the first time on appeal that his guilty findings must be set aside based on our superior court's recent ruling in *Hills*, 75 M.J. 350. There, the court determined the military judge erred in admitting charged sexual assault offenses as propensity evidence. *Id.* at 352. Additionally, the court ruled the military judge's spill-over and propensity instructions were improper as the court members were provided with "directly contradictory statements about the bearing that one charged offense could have on another." *Id.* at 357. In so finding, the court noted it could not determine if "Appellant's right to a presumption of innocence and to be convicted only by proof beyond a reasonable doubt was not seriously muddled and compromised by the instructions as a whole." *Id.* The court then examined the prejudicial effect of the error under the standard of harmless beyond a reasonable doubt given the instructional error raised constitutional due process concerns.

The Government, in its brief, argues Appellant's case is distinguishable from the holding in *Hills*. In particular, the Government suggests the issue before this court must be reviewed for plain error given Appellant's failure to object to the military judge's consideration of propensity evidence. Referencing *United States v. Henderson*, 133 S.Ct. 1121 (2013), the Government argues the military judge's ruling was not plain or obvious

error given the law was not averse to the ruling at the time of trial. Given our disposition of this case based on the lack of prejudice to this particular Appellant, we leave the resolution of the Government's argument for another day.

Regarding the assessment of prejudice, Appellant argues the military judge's error must be examined under the more stringent standard of harmless beyond a reasonable doubt. Appellant opines the military judge remains beholden to the same instructions found deficient in *Hills* when rendering her findings in this case.

We disagree, and instead apply Article 59(a), UCMJ, 10 U.S.C. § 859(a), when examining cases in which a military judge sitting alone considers charged offenses as propensity evidence. In so holding, we note military judges are presumed to know the law and to follow it, absent clear evidence to the contrary. *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997). This presumption includes the ability to maintain the presumption of innocence and apply the appropriate burden of proof in assessing Appellant's guilt—issues "seriously muddled and compromised" by the instructions provided to court members in *Hills*, 75 M.J. at 357. While we recognize the military judge did err in considering the charged offenses for propensity, we cannot extend this error to also encompass the constitutional concerns raised in *Hills* absent evidence in the record of trial. Here, we have no reason to believe the military judge misapplied either the presumption of innocence or the burden of proof in assessing Appellant's guilt. *See United States v. Wright*, 53 M.J. 476, 481 (C.A.A.F. 1997).

With the instruction concerns present in *Hills* removed, any error by the military judge in admitting propensity evidence is nonconstitutional in nature. *See United States v. Solomon*, 72 M.J. 176, 182 (C.A.A.F 2013). As such, we would be bound to uphold the findings in this case unless the error materially prejudices Appellant's substantial rights.

Regardless, in this particular case, we find the military judge's admission of propensity evidence to be harmless under even a constitutional due process analysis. Regarding the strength of the Government's case, the two victims testified under oath and were subject to the crucible of cross-examination. Their credibility was aided by either Appellant's own admissions or witness testimony that directly contradicted Appellant's version of the events.

Our belief about the importance of Appellant's admission is buttressed by the military judge's mixed findings. Appellant was only convicted of sexual assault offenses where the victim's testimony was aided by either other witnesses, Appellant's admissions, or his conflicting testimony at trial. Provided the military judge misinterpreted the presumption of innocence or burden of proof as suggested as a possibility in *Hills*, one would have expected guilty verdicts on all of the charged sexual assault offenses.

For all of these reasons, we find any errors surrounding the admission of propensity evidence in this case to be harmless beyond a reasonable doubt.

*Post-Trial Processing Discrepancies*

After receiving initial briefs from both parties, we specified two issues relating to the post-trial processing of this case. The first issue questioned whether Appellant had been provided two victim-impact statements which were submitted to the convening authority as an attachment to the addendum to the staff judge advocate's recommendation (SJAR). The second specified issue addressed a defense clemency submission that was listed as an attachment to the addendum, but not contained in the original record of trial filed with this court. The Government, in conjunction with its brief on the specified issues, requested this court consider various documents and affidavits explaining the void in the record of trial. We now grant the Government's request to attach these materials to the record of proceedings.

Proper completion of post-trial processing is a question of law, which we review de novo. *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000). Although the threshold for establishing prejudice in this context is low, the appellant must nonetheless make at least "some colorable showing of possible prejudice." *United States v. Scalo,* 60 M.J. 435, 437 (C.A.A.F. 2005).

With regard to the first specified issue, the Government submitted receipts missing from the record of trial which establish Appellant and his trial defense counsel received the victim-impact statements prior to their clemency submission to the convening authority. Notwithstanding this fact, Appellant claims R.C.M. 1106(f)(7) still requires the Government to provide Appellant with 10 additional days from the completion of the addendum to comment as the statements were new matter.

It is clear from a cursory review of the two victim-impact statements that they were being submitted for the convening authority's consideration during clemency. As such, we question whether a victim-impact statement addressed to the convening authority and previously served on an appellant would be considered new matter when later submitted to the convening authority. We need not address this issue here, however, as we find Appellant suffered no prejudice. *See United States v. Frederickson*, 63 M.J. 55, 56 (C.A.A.F. 2006). The victim-impact statements were provided to Appellant prior to his clemency submission, which provided him ample time to address any concerns raised therein. As Appellant has failed to state what, if anything, he would have submitted to deny, counter, or explain the new matter, we find he is not entitled to relief. *Id.* at 57.

In response to the second specified issue, the Government submitted an affidavit from the convening authority's staff judge advocate in which she certified the missing clemency submission was in fact reviewed and considered by the convening authority.

Given this affidavit, we are confident the convening authority considered all of Appellant's clemency submissions prior to taking action on this case. *See United States v. Craig*, 28 M.J. 321, 325 (C.M.A. 1989).

Finally, we note Appellant's trial defense provided a legally defective argument in her clemency submission when she suggested the convening authority had no authority to grant sentence relief due to the recently amended provisions of Article 60, UCMJ, 10 U.S.C. § 860. In so arguing, trial defense counsel acknowledged all of Appellant's offenses took place prior to the effective date of the Article 60, UCMJ, amendments. The fact Appellant's offenses occurred prior to the effective date provided the convening authority with the unfettered ability to disapprove findings or grant relief during clemency. *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, § 1702(d)(2), 127 Stat. 958 (2013); *see also* Exec. Order 13,730, Annex, Section 1(cc), 81 Fed. Reg. 33,331 (20 May 2016). We also note the mandatory minimum sentence requirements generated by Article 56(b), UCMJ, 10 U.S.C. § 856(b), would not be applicable here as no offense occurred on or after 24 June 2014.

After incorrectly conceding the amendment's effective date prevented Appellant's entitlement to relief on sentence, trial defense counsel suggested the convening authority should instead disapprove findings as this was the only relief available to Appellant due to the timing of his offenses. For the reasons noted above, this belief was erroneous as the convening authority retained his full powers over findings and sentence. More concerning than trial defense counsel's position, however, was the fact the convening authority's staff judge advocate failed to correct this misstatement of the law in her addendum to the SJAR.

In evaluating this error, we are mindful of our superior court's recent action in *United States v. Addison*, No. 16-0615/AF (C.A.A.F. 26 July 2016) (mem.), where the court summarily set aside this court's opinion that an appellant was not entitled to relief for a similar error. Examining this particular case for prejudice, however, we do not believe accurate advice by trial defense counsel or the staff judge advocate would have led to corrective action by the convening authority given the serious nature of Appellant's offenses. *See United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996). As such, we decline to order additional post-trial processing in this case.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ.

Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court